Opinion
 

 STEIN, J.
 

 A jury found that Martin R. Greenstein, a partner in the law firm of Baker & McKenzie, sexually harassed his secretary, plaintiff Rena Weeks and awarded her $50,000 in compensatory damages from both Green-stein and Baker & McKenzie. The jury further awarded Weeks $225,000 in punitive damages from Greenstein and $6.9 million in punitive damages from Baker & McKenzie. The latter award was reduced to $3.5 million by the trial court. The court awarded Weeks $1,847,437.86 in attorney fees and expenses. This figure was calculated, in part, by fixing reasonable hourly fees for each legal professional representing Weeks, multiplying those figures by the number of hours reasonably devoted by the respective professional to the case, and multiplying that amount by a factor of 1.7.
 

 We will affirm the judgment both as to the award of compensatory damages and as to the award of punitive damages. In so doing, we find, in part, that subdivision (a) of California’s punitive damages statute, Civil Code section 3294, states the general rule that punitive damages may be awarded only upon a showing that the defendant was guilty of oppression, fraud or malice. Subdivision (b), however, governs awards of punitive damages against employers, and permits an award for the conduct described there without an additional finding that the employer engaged in oppression, fraud or malice. We reject Baker & McKenzie’s contention that subdivision (b) establishes a kind of vicarious liability for employers such that the award of punitive damages against an employer cannot exceed the award of punitive damages assessed against the employee. We also find that California’s “private attorney general” statute, Code of Civil Procedure section 1021.5, does not authorize an award of attorney fees in an action such as this, brought by a single individual to redress her own economic injury. Finally, we find that although attorney fees were properly awarded under the Fair Employment and Housing Act (FEHA), Government Code section 12900 et seq., the trial court’s enhancement of those fees was not supported by the factors it cited as justifying the use of a multiplier of 1.7.
 

 Facts
 

 We recite the facts, resolving, as we must, all conflicts in the evidence and all legitimate and reasonable inferences that may arise therefrom in favor of
 
 *1138
 
 the jury’s findings and the verdict.
 
 (Nestle
 
 v.
 
 City of Santa Monica
 
 (1972) 6 Cal.3d 920, 925-926 [101 Cal.Rptr. 568, 496 P.2d 480];
 
 J.R. Norton Co.
 
 v.
 
 General Teamsters, Warehousemen & Helpers Union
 
 (1989) 208 Cal.App.3d 430, 444 [256 Cal.Rptr. 246].)
 

 Greenstein joined the Chicago office of Baker & McKenzie in 1971, becoming an income partner in 1978 and a capital partner in 1982. In spring 1987, a secretary in the Chicago office told Linda Johnson, the director of administration, that Greenstein had committed acts of sexual harassment against her. The secretary apparently threatened legal action. As manager of the nonlegal staff, Johnson lacked authority over Greenstein, but she told him that his conduct hád been inappropriate. She also reported the matter to . Robert Cunningham, the chairman of the Chicago office committee, telling Cunningham that she had just prevented a sexual harassment charge from being filed by the secretary. Neither Cunningham nor any other person with authority over Greenstein took action as a result of Johnson’s report.
 

 In fall or winter 1987, Johnson told Cunningham she would resign from the firm if approval was given for a salary increase sought by Greenstein for someone on his staff. Johnson told Cunningham that the increase was to prevent someone from filing a sexual harassment suit against the firm. Johnson stated that if such a suit were filed, she would be the first or second person to testify against Greenstein. The salary increase was approved, and Johnson did indeed resign. Cunningham and John Coleman, another partner on the office committee, met with Greenstein about Johnson’s allegations. Greenstein denied having engaged in any improper acts. Cunningham and Coleman took no action other than to tell Greenstein to stay away from Johnson during her remaining days with the firm and to be ultrasensitive in his future actions. Although Cunningham wrote a memorandum about the circumstances, he did not place the memorandum in Greenstein’s personnel file or otherwise establish a record of the accusations made against Green-stein. Cunningham simply kept the memorandum in his own office.
 

 In early summer or late spring of 1988, Greenstein began to bother Melinda Faier, a young associate attorney. He sent her a vulgar note. He brushed up against her. Once, when she was wearing shorts and a tank top while working over the weekend, Greenstein leaned over her, telling her that he was turned on by what she was wearing. On one or two occasions he threw a pencil at her breasts. On another occasion, when Faier was working late in the library and had kicked off her shoes, Greenstein crawled underneath the table to tickle her feet. Faier told one of Baker & McKenzie’s partners, Leslie Bertagnolli, about the incidents. Bertagnolli reported Faier’s statements to the head of the department, who reported them to Coleman,
 
 *1139
 
 who reported them to Cunningham. Cunningham and Coleman again met with Greenstein, who again denied having engaged in inappropriate behavior. Cunningham and Coleman told Greenstein that he should never put himself in a position where any employee was made uncomfortable by his acts, and that if it were to happen again, they would take steps to bring it to the attention of the firm after which they would take action against Green-stein as directed by the firm. Coleman told Greenstein that if Greenstein ever put himself into a situation where the same kind of comment or allegation might be made against him, Coleman would “kick his ass to China.” The administrative committee later heard that Faier was making statements to other associates about Greenstein’s sexual harassment of her, that she felt that she was being “set up” and unfairly treated by the firm and that she would make her claims of harassment public if her concerns were not addressed. Faier was called in and asked about these statements. She denied making them. A memorandum of the reports and Faier’s denial was written and placed in her personnel file. No other investigation was made of Faier’s claims. No documentation was made of them or of the action taken in response to them. No documentation about the claims was placed in Green-stein’s personnel file. Faier left the firm in the summer of 1989, to take a clerkship with the federal Court of Appeals. She contacted Baker & McKenzie after the clerkship ended, but was not invited to return to the firm.
 

 By late 1988, Greenstein was developing an intellectual property practice in Palo Alto, California, where he relocated in 1990. Cunningham and Coleman spoke about Greenstein to Virginia Gibson, a San Francisco partner acting as liaison for Greenstein’s relocation to California. They told Gibson that Greenstein was very bright and talented, but that he tended to engage in juvenile conduct and they had received a complaint about him from one of the associates. Gibson relayed the information to the administrative partner, Jonathan Kitchen, and to Ed Burmeister, who later succeeded Kitchen as administrative partner. When Burmeister was succeeded by Bill Atkin, Gibson told Atkin about her conversation with Cunningham and Coleman. None of these persons told individuals who might be working with Green-stein, including the personnel manager in the Palo Alto office, that Green-stein could cause problems. Gibson testified, however, that she did warn Greenstein that conduct such as had been reported would be unacceptable in Palo Alto. Greenstein denied that he had engaged in the conduct.
 

 Notwithstanding Gibson’s warning, Greenstein’s offensive conduct continued. In 1989, Greenstein met Donna Blow, a secretary in Baker & McKenzie’s San Francisco office. By July 1989 Blow became concerned about Greenstein’s conversations with her. Although Greenstein was married at the time, he would ask Blow out to dinner or over to his motel to join him
 
 *1140
 
 in a hot tub. He commented on her appearance. He made her extremely uncomfortable. Blow attempted to evade Greenstein’s invitations, but he persisted. Finally, after Greenstein sent a proposition over a “current machine” (an early form of electronic mail), Blow sent back a message that she didn’t date married people, but even if she did, she would not be inclined to date a married man because she was gay. The telephone rang about a minute later. Greenstein was on the line, breathing heavily. He said that she shouldn’t send messages like that. He then asked her if she really was gay, and when she confirmed that she was, said, “Do you think you and one of your friends, one of your girlfriends could come down and we could have a three-way?” Blow hung up. She was very upset and found herself unable to work. She went to the personnel manager, Nancy Muller, telling her about Greenstein’s conduct. Muller called Mary Contreras, the office manager of the Palo Alto office, who had responsibility for the nonlegal staff. Contreras responded: “Oh, gosh, I am going to have to talk to Bill [Atkin] about this. None of the secretaries in the Palo Alto office will work with Marty at night anymore.” It does not, however, appear that any action was taken as a result of Muller’s report.
 

 A 1989 incident involved Elyce Zahn, a secretary in the Palo Alto office. Zahn was in the office kitchen, unloading the dishwasher. Greenstein came up behind her, pulled the strap of her brassiere out of her sweater, and said, “Are you wearing a black bra?” Another attorney walked into the kitchen, and Greenstein turned away from Zahn. Zahn, telling herself she “didn’t need this crap,” walked out of Baker & McKenzie’s offices, threw her key to the office into a dumpster, and never went back. A few months later Zahn told a coworker, Myles Walker, about Greenstein’s conduct. Walker told Contreras that Zahn would not be back because she did not like working for Greenstein. There is no evidence that anyone from Baker & McKenzie spoke further with Zahn about the incident or her reasons for walking away from her job.
 

 In December 1989, Julie Haydock-Davis was working for Baker & McKenzie as a temporary receptionist. Greenstein started telling her off-color jokes, making her uncomfortable. By the third day of Haydock-Davis’s employment, Greenstein was discussing his hot tub, suggesting that she might like to join him in it. He started to rub her arm gently, stating he would show her how to do massage and one never knows where that might lead. Haydock-Davis was so uncomfortable that she called her father, who told her to “get the hell out of there now.” Haydock-Davis called the temporary agency, saying she would not be going back to Baker & McKenzie. She made a formal statement, explaining her reasons. Haydock-Davis’s complaint was reported to Contreras. Contreras told persons on the firm’s
 
 *1141
 
 administrative committee, including Burmeister, about the report. No one told Contreras to investigate the matter further. No one told her that there had been other complaints about Greenstein or that the committee intended to take any further action about the matter. The committee, however, decided that John McKenzie, another partner, should speak with Greenstein. No one informed McKenzie of the prior complaints against Greenstein. McKenzie did speak with Greenstein, who denied any knowledge of the incident. McKenzie cautioned Greenstein that he needed to be more sensitive to the way others might perceive his words or actions.
 

 McKenzie’s meeting with Greenstein was no more effective than any of the earlier meetings with him. From January through April 1990, Vicki Gardner worked as a secretary in Greenstein’s department, working primarily for Greenstein’s brother Neil and for Myles Walker, Greenstein’s paralegal. Greenstein made her uncomfortable. He told her he liked to get together in a hot tub with three or four people. He looked her over, telling her that he liked the high collar blouse she was wearing. It reminded him of his first wife. He stated that he also really liked “low collared.” He asked her if she had a boyfriend. When she said she did not, he asked how long it had been since she had a boyfriend. Once when she was working late, he came up behind her, put his hand on her shoulder in what she perceived to be a suggestive way, and said, “Oh, are you putting in an all-nighter?” If he was nearby when she entered or exited the department, he stroked his hands across her shoulder as she went by. He would touch her, look her up and down, stand very close or back her into a wall. Gardner complained about Greenstein’s behavior to Walker and to Twila Carlsen, who also worked in the department.
 

 In September 1990, Greenstein came up behind Gardner as she leaned over her desk, put his hands on her hips and pressed his body into hers. Later the same week, he put his hands on her hips as they passed in the hall. Gardner became afraid to go to her desk. The next time she was called into Contreras’s office, she blurted out that she would return to her desk only “if Marty would keep his hands to himself.” Gardner told Contreras about Greenstein’s conduct. Contreras called Atkin, then the administrative partner in San Francisco. A meeting was set up between Gardner, Atkin and Contreras. Gardner described her problems with Greenstein. Atkin appeared to be surprised about Gardner’s report, but told Gardner that he took her word for it and was willing to act on her complaints. Gardner stated that she wished to be physically removed from Greenstein’s department, that she wanted to make no written complaint, wanted her name kept out of the process and wanted Greenstein to get counseling. Gardner also suggested that they speak with Walker, and later, after receiving Twila Carlsen’s
 
 *1142
 
 permission, that they speak with Carlsen. Atkin suggested that Gardner tell Neil Greenstein her reasons for transferring, and seek his permission to move.
 

 Atkin later told Gardner that he and three other partners had met with Greenstein. He suggested that Gardner speak with a counselor personally. Gardner was in favor of the idea, although she hoped she could speak anonymously. She asked that other secretaries also be allowed to speak anonymously to the counselor. At some point Gardner asked that the firm distribute information as to how to handle complaints such as hers. Gardner was transferred, temporarily, away from Greenstein. She was told to work for Mary Rossman. Gardner did not want to work for Rossman because it would mean that she would be stationed close to Greenstein, and because she was of the opinion that Rossman was being pushed out of the firm. Gardner was concerned that she was being set up to be fired. She called the California Department of Fair Employment and Housing (DFEH), making an appointment for late November. In late October, Gardner was called to a meeting with Contreras and Neil Greenstein. She was told that she had to work for Rossman and that if she refused she would be considered to be insubordinate. She refused, and walked out.
 

 Gardner called Atkin, telling him that she was disappointed with the response to her complaints, that she had an appointment with the DFEH, and that she believed she was being set up to be fired. She asked him what was being done to make the environment safe for secretaries. She testified that no information on filing complaints had been distributed, but a joke or cartoon had been placed on the wall that seemed to treat harassment as a joke. Gardner was not comforted by Atkin’s reply. He told her that “I had made an allegation. Marty had made a denial. He said as regards my access to a counselor, he said counseling input by the victim is discretionary, so he wouldn’t give me the name of the counselor. He said we are not a judge and a jury. You’d have to go to court for that. He said, we’ll not be dictated to by secretaries as to their assignments.”
 

 Gardner testified that she continued to work for Neil Greenstein, but her work load changed. She was assigned more work, but her support was decreased. Neil Greenstein began to ridicule her as a person and to ridicule her work. Gardner was told that there were no other options available to her in Palo Alto. She ultimately requested transfer to an opening in word processing. Contreras told her that the new position would have less desirable hours and would involve working for anyone at the Palo Alto branch of Baker & McKenzie. Gardner stated that those conditions were fine. Contreras told her that the new position would involve a reduction in pay.
 
 *1143
 
 Gardner said that would not be fine. She wanted to treat the word processing job as a transitional position where she would stay only until a more permanent position became available. Contreras later told Gardner that she could keep her present salary but “that it would not be transitional and there would be a termination date of February 28, 1991, that there was no place for [Gardner] at Baker McKenzie.” Gardner left the firm at the end of February.
 

 In the meantime, as Gardner had suggested, Contreras spoke to Twila Carlsen. Carlsen told her that Greenstein made her uncomfortable. He made “dumb blonde” jokes around her, suggesting that she was a dumb blonde. He asked her if she had a social disease. He put his face uncomfortably close to hers. On one occasion Carlsen was sitting at her desk when she felt something poke into her back. Greenstein was behind her. When she asked him what was in her back, he said, “Just happy to see you.” Carlsen stated that she did not want to work for Greenstein. Contreras later told Carlsen that Baker & McKenzie’s management was aware of problems between Green-stein and women employees, but they could not compel him to go into counseling. Atkin recalled that no counseling occurred because Contreras was unable to find a counselor willing to work with Greenstein unless Gardner was willing to give up her anonymity.
 

 During this time period another employee, Stephanie Brookins, told Contreras that she wanted to speak to her about Greenstein. The subject of Brookins’s planned discussion had nothing to do with sexual harassment, but before she began to speak, Contreras asked her, “Is this about sexual harassment?”
 

 Weeks began to work as Greenstein’s secretary on July 23, 1991. She had little to do with Greenstein at first as she was attending training classes to learn about a new computer system. On August 8, the Thursday of her third week at the firm, Weeks had lunch with several persons, including Green-stein, at a local restaurant. As they left the restaurant, Greenstein gave her some M&M candies, which she put into the breast pocket of her blouse. A short time later, as they walked to Greenstein’s car, Greenstein pulled Weeks back, put his arm over her shoulder, put his hand in her breast pocket and dropped more candies into the pocket. He then put his knee in her lower back, pulled her shoulders back, and said, “Let’s see which breast is bigger.” Weeks was shocked, and found it hard to concentrate on her work for the rest of the day. The following day she spoke with Greenstein’s other secretary, Sandra Tischler-Bass, who told her that it sounded like something Greenstein would do and to let Tischler-Bass take care of it. The following week Greenstein was highly critical of Weeks’s work. On August 14, Weeks ran into Greenstein as he was carrying a box. He put the box down, lunging
 
 *1144
 
 towards her with his hands cupped. When she moved back, crossing her hands over her chest, he asked if she was afraid that he was going to grab her. The following day Weeks and several others, including Greenstein, had lunch at a local restaurant. Weeks’s food arrived first, but Greenstein grabbed it and wolfed it down. He later turned to Weeks, asking her, “What’s the wildest thing you have ever done?” In the meantime, Greenstein continued to be critical of Weeks’s work, yelling at her and calling her an imbecile. She was becoming petrified. A short time later, Weeks agreed to help Tischler-Bass move some file cabinets out of Greenstein’s office into Tischler-Bass’s van and then to Greenstein’s house. At one point Weeks was leaning over the van, arranging things, when she felt someone grab her buttocks. It was Greenstein. Tischler-Bass then pulled her along, saying, “You are coming with me.” Weeks testified that Greenstein’s conduct left her petrified, angry and confused.
 

 On August 23, an employee handbook was left on Weeks’s desk. In it Weeks found a statement of the firm policy on sexual harassment. After reading it, Weeks contacted Contreras. She told Contreras about the problems she was having with Greenstein, describing the behavior she perceived to be sexual harassment. Contreras sent Weeks home for the day. Contreras later told her that the administrative committee felt that it was best that Weeks transfer to another department. Contreras made notes of her conversations with Weeks, placing them in Weeks’s file. Nothing, however, was placed in Greenstein’s file. The administrative committee gave Contreras no instructions about investigating Weeks’s claims other than to tell her to speak with Tischler-Bass. Contreras reported back to the committee that she believed Weeks’s claims had substance.
 

 Weeks was assigned to work for a paralegal, Mary Boyd, and an attorney, John Peterson. Although Greenstein was only infrequently in that part of the office, Weeks was nervous about him. Shortly after she returned to work, Greenstein walked to the desk next to her and just stared at her for perhaps a minute. No one spoke with Weeks about her claims. Contreras, Boyd and Peter Astiz (an attorney on the administrative committee) did meet with Weeks in mid-September, but not about her claims of sexual harassment. Boyd was unhappy with Weeks’s performance. Contreras told Weeks that she had not worked out since the beginning and was still not working up to the firm’s expectations. When Weeks protested that she had been affected by Greenstein’s behavior, she was told that had nothing to do with it. Weeks left Baker & McKenzie at the end of September.
 

 In the meantime, on August 30, 1991, the administrative committee met about Greenstein. The committee suggested that Greenstein attend sexual
 
 *1145
 
 harassment counseling. Greenstein agreed to the counseling. The committee asked Contreras to obtain some referrals to counselors. The committee interviewed a recommended counselor, Trisha Brinkman, within two weeks of Weeks’s complaint. In February, Greenstein attended two sessions with Brinkman, for which he was charged personally. Brinkman reported that the training was successful and that she did not see an immediate need for additional counseling.
 

 In December 1991, Weeks filed a claim with the federal Equal Employ- ' ment Opportunity Commission (EEOC). The EEOC asked Baker & McKenzie about the existence of any complaints of sexual harassment other than those made by Weeks. Baker & McKenzie responded that there may have been one other claim, but it had been withdrawn.
 
 [1]
 
 The EEOC declined to pursue the matter further. By this time Weeks was meeting with a psychologist, and had determined that she needed to take some action to keep from feeling like a victim. She found an attorney and filed her complaint on May 20, 1992. She testified that she started to feel better after legal proceedings were initiated and learned that other women had had experiences with Greenstein similar to hers.
 

 Baker & McKenzie monitored the proceedings initiated by Weeks. The firm did not itself investigate Greenstein’s conduct or take any action against him for over a year. As late as April 1993, Baker & McKenzie’s position was that it would take appropriate action when the judicial process had been completed. Nonetheless, at the end of August 1993, and before the judicial process had been completed, Baker & McKenzie did act to remove Green-stein from the partnership. The decision to remove Greenstein, however, was precipitated not by his acts of sexual harassment, but by the deposition testimony of Greenstein’s paralegal, Timothy Wollaston, that Greenstein had been back-dating documents. Within two days of the deposition, Baker & McKenzie initiated an investigation into Wollaston’s allegations. Greenstein was asked to resign on August 27, and his practice put into receivership within a few days of that request. Greenstein was told that he would be removed in October if he failed to leave on his own accord. Greenstein resigned on October 11, 1993.
 

 
 *1146
 
 Discussion
 

 I.
 

 Sexual Harassment Under the Fair Employment and Housing Act (Gov.
 

 Code, § 12900 et seq.; FEHA)
 

 The FEHA makes unlawful the sexual harassment of an employee by any person. (Gov. Code, § 12940, subd.
 
 [2]
 
 Under Government Code section 12940, subdivision (h)(1), an employer is strictly liable for acts of sexual harassment committed by an agent or supervisor.
 
 (Kelly-Zurian
 
 v.
 
 Wohl Shoe Co.
 
 (1994) 22 Cal.App.4th 397, 415 [27 Cal.Rptr.2d 457].)
 
 [3]
 
 In addition, Government Code section 12940, subdivision (i) makes it unlawful “[f]or an employer ... to fail to take all reasonable steps necessary to prevent discrimination and harassment from occurring.” Sexual harassment is defined as including “ ‘ “[u]nwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature.” ’ ”
 
 {Fisher
 
 v.
 
 San Pedro Peninsula Hospital
 
 (1989) 214 Cal.App.3d 590, 607 [262 Cal.Rptr. 842].) It typically is viewed as taking one or both of two forms: (1) quid pro quo harassment, where submission to sexual conduct is made a condition of concrete employment benefits, and (2) hostile work environment, defined as conduct having the purpose or effect of unreasonably interfering with an individual’s work performance or creating an intimidating, hostile, or offensive working environment. (Ibid.)
 
 [4]
 
 Weeks’s theory here was that she had been subjected to a hostile working environment. She did not claim quid pro quo harassment.
 

 
 *1147
 
 II.
 

 Evidence of Sexual Harassment
 

 (2) Baker & McKenzie does not attack the jury’s finding that it was liable for compensatory damages, and does not complain that the evidence failed to support the jury’s finding that Greenstein sexually harassed Weeks. Greenstein, however, does attack that finding as being unsupported by the evidence. He concedes that there was evidence that he reached into Weeks’s breast pocket, gestured as if to cup her breasts in his hands, touched her buttocks and quizzed her about the wildest thing she had ever done. In addition to these conceded actions, there was evidence that Greenstein pulled Weeks’s shoulders back to “see which breast is bigger.” Greenstein downplays the probable effect of this conduct, but Weeks testified that Greenstein’s conduct left her petrified, angry and confused, and made it difficult for her to concentrate on her work. The evidence thus supports the finding that Greenstein’s conduct unreasonably interfered with Weeks’s work performance and/or created an intimidating, hostile, or offensive working environment.
 

 Employer’s Liability for Punitive Damages Under the FEHA
 

 The FEHA does not itself authorize punitive damages. It is, however, settled that California’s punitive damages statute, Civil Code section 3294,
 
 *1148
 
 applies to actions brought under the FEHA, including actions brought for sexual harassment.
 
 (Commodore Home Systems, Inc.
 
 v.
 
 Superior Court
 
 (1982) 32 Cal.3d 211 [185 Cal.Rptr. 270, 649 P.2d 912];
 
 Kelly-Zurian
 
 v.
 
 Wohl Shoe Co., supra, 22
 
 Cal.App.4th at pp. 419-420.)
 

 
 *1147
 
 III.
 

 
 *1148
 
 Civil Code section 3294 provides in relevant part:
 

 “(a) In an action for the breach of an obligation not arising from contract, where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant.
 

 “(b) An employer shall not be liable for damages pursuant to subdivision (a), based upon acts of an employee of the employer, unless the employer had advance knowledge of the unfitness of the employee and employed him or her with a conscious disregard of the rights or safety of others or authorized or ratified the wrongful conduct for which the damages are awarded or was personally guilty of oppression, fraud, or malice. With respect to a corporate employer, the advance knowledge and conscious disregard, authorization, ratification or act of oppression, fraud, or malice must be on the part of an officer, director or managing agent of the corporation.”
 
 [5]
 

 Prior to 1980, section 3294 did not expressly address the question of employer liability for punitive damages for the actions of an employee. Such liability, however, was well established. As explained in the 1974 case of
 
 Hale
 
 v.
 
 Farmers Ins. Exch.
 
 (1974) 42 Cal.App.3d 681 [117 Cal.Rptr. 146] (overruled on other grounds in
 
 Egan
 
 v.
 
 Mutual of Omaha Ins. Co.
 
 (1979) 24 Cal.3d 809, 822, fn. 5 [169 Cal.Rptr. 691, 620 P.2d 141]): “California follows the rule laid down in Restatement of Torts, section 909, which provides punitive damages can properly be awarded against a principal because of an act by an agent if, but only if ‘(a) the principal authorized the doing and the manner of the act, or (b) the agent was unfit and the principal was reckless in employing him, or (c) the agent was employed in a managerial capacity and was acting in the scope of employment, or (d) the
 
 *1149
 
 employer or a manager of the employer ratified or approved the act.’ ”
 
 (Hale, supra,
 
 at p. 691.)
 

 Comment b to section 909 of the Restatement Second of Torts states the rationale behind imposing punitive damages liability on employers for the wrongful conduct of employees: “The rule stated in this Section results from the reasons for awarding punitive damages, which make it improper ordinarily to award punitive damages against one who himself is personally innocent and therefore liable only vicariously. It is, however, within the general spirit of the rule to make liable an employer who has recklessly employed or retained a servant or employee who was known to be vicious, if the harm resulted from that characteristic. . . . Nor is it unjust that a person on whose account another has acted should be responsible for an outrageous act for which he otherwise would not be if, with full knowledge of the act and the way in which it was done, he ratifies it, or, in cases in which he would be liable for the act but not subject to punitive damages, he expresses approval of it. . . . In these cases, punitive damages are granted primarily because of the principal’s own wrongful conduct, [¶] Although there has been no fault on the part of a corporation or other employer, if a person acting in a managerial capacity either does an outrageous act or approves of the act by a subordinate, the imposition of punitive damages upon the employer serves as a deterrent to the employment of unfit persons for important positions.”
 
 [6]
 
 (Rest.2d Torts, § 909, com. b, at p. 468.)
 

 By 1980, proponents of tort reform, concerned that existing law could be interpreted too broadly, drafted Senate Bill No. 1989 (1979-1980 Reg.
 
 *1150
 
 Sess.). It was felt that under existing law employers might be found liable for punitive damages when the employers’ actions were merely negligent or reckless. It therefore was proposed that “malice,” “fraud” and “oppression,” in the context of employer liability for punitive damages, be defined in a manner that would preclude liability for reckless or negligent acts. A second concern was that an employer might be found liable for negligently or recklessly failing to investigate the backgrounds of employees, and it was noted that other laws prohibit employers from using certain information in making hiring decisions. As a result, proponents of Senate Bill No. 1989 (1979-1980 Reg. Sess.) promoted the use of the term “conscious disregard” in place of “reckless” as it appeared in the Restatement of Torts.
 
 [7]
 
 Proponents also were concerned about a recent Supreme Court decision,
 
 Egan
 
 v.
 
 Mutual of Omaha Ins. Co, supra,
 
 24 Cal.3d 809. The Supreme Court determined there that an employing insurance company might be liable for punitive damages because of the conduct of two employees who caused harm while acting within their authority, but who were not classified as “managerial employees.” The Supreme Court reasoned that employer liability should turn not on the employees’ classification, but on the extent of the discretion conferred upon them. “ ‘Defendant should not be allowed to insulate itself from liability by giving an employee a nonmanagerial title and relegating to him crucial policy decisions.’ ”
 
 (Id.
 
 at p. 823, quoting from the dissenting opinion in
 
 Merlo
 
 v.
 
 Standard Life & Acc. Ins. Co.
 
 (1976) 59 Cal.App.3d 5, 25
 
 *1151
 
 [130 Cal.Rptr. 416].) Senator Kenneth L. Maddy, who introduced Senate Bill No. 1989, wrote to Governor Brown that under
 
 Egan
 
 and the Restatement Second of Torts, an employer might be liable for punitive damages for conduct of an employee acting in a “managerial capacity.” “In other words, the employer may be found to have authorized his employee’s outrageous acts merely by authorizing the employee to act on his behalf.” Senator Maddy explained: “SB 1989 repudiates this standard altogether by dispensing with the vague term ‘managerial capacity.’ In its place the term ‘managing agent’ is used to describe the lowest level person within a corporation who must be ‘personally guilty of oppression, fraud [or] malice’ or possess the requisite ‘advance knowledge’ and ‘authorize or ratify’ the conduct at issue before punitive damages can be assessed against the corporation. The term ‘managing agent’ is, of course, a term of art that refers to a function, and not a mere title. It remains for the ‘judiciary’ to flesh out a meaning for ‘managing agent’ in the factual context of each case before it.” (Letter from Senator Kenneth L. Maddy to Governor Brown (Sept. 2, 1980) p. 4.)
 

 Senate Bill No. 1989 (Sept. 2, 1980) (1979-1980 Reg. Sess.) was adopted in 1980. (Stats. 1980, ch. 1242, § 1, p. 4217.) As a result, the existing provisions of Civil Code section 3294 were restated in a newly created subdivision (a), and subdivisions (b) and (c) were added. Subdivision (b) essentially restates prior law but, as Senator Maddy promised, limits employer liability to actions taken by “managing agents” and employs the phrase “conscious disregard” to prevent liability from attaching for the reckless or negligent employment of an injuring employee. Subdivision (b) is not a model of clarity, but in light of California’s history of employer liability for punitive damages and of the Legislature’s reasons for enacting subdivision (b), we have no doubt that it does no more than codify and refine existing law. Subdivision (b) thus authorizes the imposition of punitive damages on an employer in three situations: (1) when an employee was guilty of oppression, fraud or malice, and the employer with advance knowledge of the unfitness of the employee employed him or her with a conscious disregard of the rights or safety of others, (2) when an employee was guilty of oppression, fraud or malice, and the employer authorized or ratified the wrongful conduct, or (3) when the employer was itself guilty of the oppression, fraud or malice.
 

 In addition, in proposing Senate Bill No. 1989, proponents of tort reform sought to protect defendants from being subjected to extensive and expensive pretrial discovery into their financial affairs until a plaintiff establishes that he or she is likely to prevail on a punitive damages claim. (Letter from Senator Maddy to Governor Brown,
 
 supra,
 
 p. 4.) The Legislature therefore enacted Civil Code section 3295. Among other things, Civil Code section 3295 requires trial courts, at the request of a defendant, to bifurcate the proceedings so as to preclude the admission of evidence of a defendant’s
 
 *1152
 
 profits or financial condition until after the trier of fact has returned a verdict for the plaintiff awarding actual damages and finding the defendant liable for punitive damages.
 
 [8]
 

 The trial here was bifurcated in accordance with Civil Code section 3295. At the close of the first phase of the trial, and in order to determine whether it might hear evidence of Baker & McKenzie’s financial worth, the jury was asked the following questions, submitted to it on a special verdict form:
 

 “Has plaintiff Rena Weeks proved by clear and convincing evidence that defendant Martin Greenstein was guilty of oppression or malice in his conduct upon which you base your finding of sexual harassment?”
 

 
 *1153
 

 “Has plaintiff Rena Weeks proved by clear and convincing evidence that defendant Baker & McKenzie (a) had advance knowledge of the unfitness of defendant Martin R. Greenstein and with a conscious disregard of the rights or safety of others continued to employ him, or (b) ratified the conduct of Mr. Greenstein which is found to be oppression or malice?”
 

 The jury answered “yes” to each question. Baker & McKenzie nonetheless argues that the award of punitive damages against it was improper for any of several reasons.
 

 A.
 
 Necessity of Proving the Employer Itself Was Guilty of Malice, Oppression or Fraud
 

 Baker & McKenzie argues that the jury could not assess punitive damages directly against it absent a showing that Baker & McKenzie itself was guilty of oppression, fraud, or malice. Baker & McKenzie complains that the jury here made no such finding, and indeed, was not asked whether Baker & McKenzie itself was guilty of oppression, fraud or malice.
 
 [9]
 

 Baker & McKenzie thus interprets Civil Code section 3294 as permitting an award of punitive damages directly against an employer only upon a showing that the employer both engaged in the conduct defined by subdivision (b), and was itself guilty of fraud, oppression or malice, i.e., the conduct authorizing liability for punitive damages under subdivision (a). The history of the statute, however, does not support that interpretation. To the contrary, it seems that proponents of Senate Bill No. 1989 understood and accepted that employers might be found directly liable for punitive damages in any of the situations outlined in Civil Code section 3294, subdivision (b), without an additional explicit finding that the employer was guilty of fraud, oppression or malice. Senator Maddy thus urged the use of the term “managing agent” “to describe the lowest level person within a corporation who must be ‘personally guilty of oppression, fraud [or] malice’
 
 or
 
 possess the requisite ‘advance knowledge’ and ‘authorize
 
 or
 
 ratify’ the conduct at issue before punitive damages can be assessed against the corporation.” (Letter from Senator Maddy to Governor Brown,
 
 supra,
 
 p. 4, italics added.) Even absent this expression of legislative understanding, Baker & McKenzie’s interpretation renders surplusage the third alternative for employer liability set forth in subdivision (b), i.e., that the employer itself have been guilty of
 
 *1154
 
 “oppression, fraud or malice.” It is a cardinal rule of statutory construction that a construction that renders some words surplusage is to be avoided.
 
 (City of Huntington Park
 
 v.
 
 Superior Court
 
 (1995) 34 Cal.App.4th 1293, 1300 [41 Cal.Rptr.2d 68];
 
 Shoemaker
 
 v.
 
 Myers
 
 (1990) 52 Cal.3d 1, 22 [276 Cal.Rptr. 303, 801 P.2d 1054; 20 A.L.R.5th 1016].)
 

 It is true, as Baker & McKenzie points out, that the court in
 
 College Hospital Inc.
 
 v.
 
 Superior Court
 
 (1994) 8 Cal.4th 704 [34 Cal.Rptr.2d 898, 882 P.2d 894] at page 721 held that Civil Code section 3294, subdivision (b) imposes “additional” requirements on plaintiffs attempting to hold an employer liable for punitive damages based upon the acts of an employee.
 
 College Hospital
 
 does not, however, stand for the proposition that the plaintiff has the burden of showing that the employer engaged in oppression, fraud or malice over and above the conduct described in subdivision (b). Instead, the court there recognized that the conduct described in subdivision (b) is the equivalent of oppression, fraud, or malice. “California has traditionally allowed punitive damages to be assessed against an employer (or principal) for the acts of an employee (or agent) only where the circumstances indicate that the employer himself was guilty of fraud, oppression, or malice. Thus, even before section 3294, subdivision (b) was added to the Civil Code in 1980, the courts required evidence that the employer authorized or ratified a malicious act, personally committed such an act, or wrongfully hired or retained an unfit employee.” (8 Cal.4th at p. 723.) The “additional” burden on a plaintiff seeking punitive damages from an employer is to show not only that an
 
 employee
 
 acted with oppression, fraud or malice, but that the
 
 employer
 
 engaged in conduct defined in subdivision (b).
 

 B.
 
 Employer Liability Under Civil Code Section 3294, Subdivision (b) as Only “Vicarious.”
 

 A second argument is that even if punitive damages might be assessed against an employer without a showing that the employer itself engaged in oppression, fraud or malice, employer liability is merely vicarious. Baker & McKenzie contends that because its liability is merely vicarious, the award of punitive damages assessed against it can be no greater than the award assessed against Greenstein.
 

 Civil Code section 3294, subdivision (b) does not authorize an award of punitive damages against an employer for the employee’s wrongful conduct. It authorizes an award of punitive damages against an employer for the employer’s
 
 own
 
 wrongful conduct. Liability under subdivision (b) is vicarious only to the extent that the employér is liable for the actions of its officer, director or managing agent in hiring or controlling the offending employee,
 
 *1155
 
 in ratifying the offense or in acting with oppression, fraud or malice. It is not vicarious in the sense that the employer is liable for the wrongful conduct of the offending employee. Civil Code section 3294 contains no provision expressly limiting the award of punitive damages assessed against an employer to the amount assessed against the employee, and there is not the faintest suggestion that the Legislature intended to so limit the damages assessed against an employer. The purpose for awarding punitive damages is to punish wrongdoing and thereby protect the public from future misconduct, either by the same defendant or other potential wrongdoers.
 
 (Adams
 
 v.
 
 Murakami
 
 (1991) 54 Cal.3d 105, 110 [284 Cal.Rptr. 318, 813 P.2d 1348].) An employer only vicariously liable for an employee’s actions should not be punished at all because the employer is free from wrongdoing. On the other hand, where the employer itself is guilty of wrongdoing, limiting an award of punitive damages to the amount assessed against the employee could have little deterrent effect. “ ‘[O]bviously, the function of deterrence . . . will not be served if the wealth of the defendant allows him to absorb the award with little or no discomfort. . . .’”
 
 (Ibid.)
 
 It therefore is hardly surprising that no court has adopted Baker & McKenzie’s position, and that a number of courts have affirmed awards that are inconsistent with that position. (E.g.,
 
 Roberts
 
 v.
 
 Ford Aerospace & Communications Corp.
 
 (1990) 224 Cal.App.3d 793 [274 Cal.Rptr. 139] [$750,000 punitive damages assessed against employer, no punitive damages assessed against employees];
 
 Pusateri
 
 v.
 
 E. F. Hutton & Co.
 
 (1986) 180 Cal.App.3d 247 [225 Cal.Rptr. 526] [$160,000 punitive damages against the employer, no punitive damages against any employee];
 
 Greenfield
 
 v.
 
 Spectrum Investment Corp.
 
 (1985) 174 Cal.App.3d 111 [219 Cal.Rptr. 805], overruled on other grounds in
 
 Lakin
 
 v.
 
 Watkins Associated Industries
 
 (1993) 6 Cal.4th 644, 664 [25 Cal.Rptr.2d 109, 863 P.2d 179] [$400,000 punitive damages against employer, $42,500 punitive damages against the employee].)
 

 Baker & McKenzie cites language in Civil Code section 3295 as supporting its position. It will be recalled that section 3295 was enacted to prevent discovery or disclosure of a defendant’s financial worth until some showing is made that punitive damages would be awarded against that defendant. Baker & McKenzie cites subdivision (d): “The court shall, on application of any defendant, preclude the admission of evidence of that defendant’s profits or financial condition until after the trier of fact returns a verdict for plaintiff awarding actual damages and finds that a defendant is guilty of malice, oppression, or fraud ....
 
 Evidence of profit and financial condition shall be admissible only as to the defendant or defendants found to be liable to the plaintiff and to be guilty of malice, oppression, or fraud.”
 
 (Italics added.) Baker & McKenzie reads this provision as precluding disclosure of an employer’s financial condition unless and until there is a finding that the
 
 *1156
 
 employer itself engaged in oppression, fraud or malice. The argument is that where an employee has been found guilty of oppression, fraud or malice under Civil Code section 3294, subdivision (a), but employer liability is based on the findings required by subdivision (b), only the employee’s financial condition may be disclosed and the amount of punitive damages must be limited to those assessed against the employee. Adoption of this argument would mean that the Legislature intended to alter existing substantive law governing assessment of punitive damages by means of a provision regulating the introduction of evidence. “[I]t should not be presumed that the legislative body intends to overthrow long-established principles of law unless such intention is made clearly to appear either by express declaration or by necessary implication.”
 
 (People
 
 v.
 
 Davenport
 
 (1985) 41 Cal.3d 247, 266 [221 Cal.Rptr. 794, 710 P.2d 861].) In our opinion, the language of Civil Code section 3295, subdivision (d), simply confirms that the Legislature views the conduct described in section 3294, subdivision (b) as the equivalent of employer oppression, fraud or malice.
 

 C.
 
 Employer’s Duty to Terminate Errant Employee
 

 Baker & McKenzie interprets Civil Code section 3294, subdivision (b) as requiring an employer to
 
 terminate
 
 the employment of an “unfit” employee or be subject to liability for punitive damages. Baker & McKenzie therefore contends that “[t]he punitive damages award against Baker can stand only if the information possessed by Baker
 
 prior
 
 to July 1991 (when it first employed Plaintiff) was sufficient to brand Greenstein ‘unfit’ so that nothing short of
 
 termination
 
 was acceptable. Affirmation of that award would require this court to say that, as a matter of law, Baker had
 
 no
 
 alternative but to
 
 fire
 
 Greenstein. That conclusion would have profound and serious consequences for California’s labor force.” Baker & McKenzie thus emphasizes the duty owed by an employer to its employees to continue employment unless severe wrongdoing has been proven, and even then to take measures short of termination if such measures may prevent the recurrence of the wrongful behavior. A related argument is that whether termination is justified should be a question of law for the court to resolve and that it therefore was error to submit the question here to a jury.
 
 [10]
 

 
 *1157
 
 Baker & McKenzie’s argument falls short if Civil Code section 3294, subdivision (b) is read not as imposing a duty on an employer to
 
 terminate
 
 a harassing employee, but as imposing a duty on the employer to take reasonable measures to prevent a known harasser from committing future acts of harassment. As Baker & McKenzie correctly asserts, there are methods of forestalling harassment that fall short of outright termination, and it is unreasonable and probably violative of public policy to require an employer to terminate any and every employee that might be expected to act inappropriately towards his or her fellow workers.
 
 [11]
 
 Nothing in the language of Civil Code section 3294 itself mandates that it be interpreted to require termination of abusive employees. It is true that the phrase “employed him or her with a conscious disregard of the rights or safety of others” is susceptible to the interpretation that an employer must terminate employees that are likely to abuse other employees. That language, however, is equally susceptible to the interpretation that the employer may not employ the abusive employee without taking reasonable steps to prevent him or her from being or continuing to be abusive. We interpret the letter of the law, if possible, to conform to the spirit of the act.
 
 (Whitman
 
 v.
 
 Superior Court
 
 (1991) 54 Cal.3d 1063, 1072 [2 Cal.Rptr.2d 160, 820 P.2d 262].) Statutes should be given “a reasonable and commonsense interpretation consistent with the apparent purpose and intention of the Legislature, practical rather than technical in nature, and which, when applied, will result in wise policy rather than mischief or absurdity. [Citations.]”
 
 (Beaty
 
 v.
 
 Imperial Irrigation Dist.
 
 (1986) 186 Cal.App.3d 897, 902 [231 Cal.Rptr. 128].) A reasonable attempt to curb or prevent the abusive behavior of employees does not demonstrate the conscious disregard of the rights or safety of third persons that would permit an award of punitive damages under Civil Code section 3294. The public policy at issue is not to fire errant employees, but to protect employees from abusive or hostile work environments and/or from abusive and hostile coworkers. The question, therefore, is not whether the employee’s misconduct was such that termination was the only option, but whether the employer took reasonable steps to prevent the misconduct. The better approach to the phrase “employed him with a conscious disregard of the rights or safety of others,” therefore, is to interpret it as meaning that the employer may not employ or continue to employ the errant employee
 
 *1158
 
 without taking action reasonably designed to protect the rights or safety of others.
 
 [12]
 

 Baker & McKenzie warns that construing Civil Code section 3294, subdivision (b) as authorizing punitive damages for the failure to take reasonable steps to prevent abuse exposes employers to punitive damages for conduct no more egregious than that which permits an award of compensatory damages under Government Code section 12940, subdivision (i) (i.e., for failing “to take all reasonable steps necessary to prevent discrimination and harassment from occurring”). As Baker & McKenzie itself points out in a later portion of its opening brief, however, liability under Civil Code section 3294, subdivision (b) requires actual knowledge by an employer, while liability under Government Code section 12940 does not.
 
 [13]
 
 Liability attaches under section 12940, subdivision (i) for an “employer’s” failings. “Employer” is defined as including “agents or supervisors.” Under Civil Code section 3294, subdivision (b), liability attaches only if the employer or an “officer, director, or managing agent” fails to act. Liability under Government Code section 12940, subdivision (i) may be predicated on negligent conduct. Liability under Civil Code section 3294 requires “conscious disregard,” a phrase specifically included in the statute to prevent liability from attaching from the reckless or negligent employment of an injuring employee. Finally, liability under Government Code section 12940, subdivision (i) authorizes an award of compensatory damages for the failure to take “all” reasonable steps. Because an award of punitive damages under Civil Code section 3294, subdivision (b) may be had only where the employer’s acts or omissions demonstrate “conscious disregard,” an employer need only take such steps as demonstrate that it is making a good faith attempt to protect the rights or safety of others.
 

 
 *1159
 
 Under our interpretation of Civil Code section 3294, subdivision (b), there is no real question but that the evidence supports the finding that Baker & McKenzie or a managing agent of Baker & McKenzie had advance knowledge that Greenstein was likely to sexually harass employees such as Weeks, and that it exhibited conscious disregard for the rights and safety of others by failing to take reasonable steps to prevent Greenstein’s misconduct. There was evidence that by spring 1987, Greenstein’s propensity to engage in harassing conduct had come to the attention of managing agents of the firm. Baker & McKenzie, however, failed to take any formal action to prevent further misconduct until after Weeks’s complaints. Notwithstanding Baker & McKenzie’s failure to take corporate responsibility for Greenstein’s behavior, informal reports of Greenstein’s conduct followed him. Indeed, it can be inferred from the evidence that it was common knowledge that Greenstein harassed female employees. Greenstein was occasionally warned or chastised about the misconduct, but the misconduct continued. The ineffectiveness of the warnings given Greenstein may have resulted from Baker & McKenzie’s failure to make any useful documentation of Greenstein’s misconduct, or may have resulted from a corporate desire to avoid alienating a productive partner despite the injury he could be expected to cause to employees. Whatever the cause of Baker & McKenzie’s inaction, it certainly tended to communicate both to Greenstein and to those who worked around him that Baker & McKenzie did not take his misconduct seriously. There is evidence that persons who complained about Greenstein’s actions were transferred or were themselves terminated as employees with the firm. There is evidence that Bill Atkin, the head of the administrative committee both before and after Weeks was employed, knew that a number of allegations had been made against Greenstein, and indeed believed that Greenstein had engaged in serious misconduct. There is evidence that one of the earlier claimants (Vicki Gardner) pressed Atkin to see to it that Greenstein received counseling. She also asked that information about sexual harassment be distributed to Baker & McKenzie employees. There is evidence that Atkin took no steps to protect Gardner or other employees from Greenstein, except that he held yet another ineffectual meeting with Greenstein, even after Gardner complained that someone later had posted an offensive cartoon near her work station. Gardner, like the other lower level employees who complained about Greenstein, was transferred and ultimately told to leave the firm. In sum, there is evidence that although the firm kept records on complaints made about lower level employees, and took action against those employees as a result of complaints, it turned a blind eye to complaints made about Greenstein. There is evidence that the firm’s attitude towards complaints by a lower level employee was to ignore it or dismiss it on the grounds that it was just that employee’s word against Greenstein’s, even if the employee’s word in fact was supported by other evidence.
 

 
 *1160
 
 In all events, there is substantial evidence that at the time Weeks was hired, Baker & McKenzie and its relevant managing agents were well aware that Greenstein was likely to create a hostile work environment for women, and that Baker & McKenzie consistently failed to take measures reasonably designed to protect women from Greenstein’s abuse. The failure to place reports of Greenstein’s misconduct in his own personnel file so as to warn future supervisors of that conduct in and of itself demonstrates a conscious disregard for the rights and safety of other employees. No formal action was taken by the firm to prevent Greenstein from creating a hostile work environment. No effective
 
 informal
 
 action was taken to prevent Greenstein’s wrongful conduct, notwithstanding specific requests and suggestions by at least one person injured by that conduct. The evidence suggests that Weeks was a highly foreseeable target of Greenstein’s misconduct, but that no steps were taken to prevent that misconduct, to warn her that it might occur or to inform her of her rights and options if it did occur. The evidence thus supports the jury’s conclusion that Baker & McKenzie itself engaged in conduct justifying an award of punitive damages against the firm.
 
 [14]
 

 IV.
 

 Admission of Evidence of Greenstein’s Conduct Towards Other Employees
 

 Baker & McKenzie complains that the jury was permitted to hear evidence of Greenstein’s conduct towards employees occurring prior to Weeks’s employment, that Weeks’s counsel was permitted to cite that evidence to the jury during argument and that the jury was asked, by means of a special verdict form, if Baker & McKenzie had failed to take all reasonable steps to prevent the sexual harassment of Weeks. Baker & McKenzie contends that such evidence was relevant only to the theory that it was liable for compensatory damages under Government Code section 12940, subdivision (i) (making it unlawful for an employer “to fail to take all reasonable steps necessary to prevent discrimination [or] harassment from occurring”). Baker & McKenzie contends that the evidence was improperly admitted because this theory became moot when it stipulated it would be liable for compensatory damages under Government Code section 12940, subdivision (h)(1) if the jury found that Greenstein had sexually harassed Weeks.
 

 We accept without analysis Baker & McKenzie’s contention that by stipulating to liability for compensatory damages resulting from Greenstein’s acts of sexual harassment, Baker & McKenzie established grounds for
 
 *1161
 
 objecting to evidence introduced to support the theory that it was liable for failing to take all reasonable steps necessary to prevent discrimination or harassment from occurring.
 
 [15]
 
 It does not follow, however, that evidence of Greenstein’s earlier conduct became inadmissible. The majority of the evidence at issue was relevant not only to the question of Baker & McKenzie’s liability for compensatory damages under Government Code section 12940, subdivision (i), but also to the question of its liability for punitive damages under Civil Code section 3294, subdivision (b). (See
 
 Bihun
 
 v.
 
 AT&T Information Systems, Inc.
 
 (1993) 13 Cal.App.4th 976, 990-991 [16 Cal.Rptr.2d 787], overruled on other grounds in
 
 Lakin
 
 v.
 
 Watkins Associated Industries, supra,
 
 6 Cal.4th at p. 664.) The evidence therefore was admissible whether or not Baker & McKenzie’s stipulation rendered moot Weeks’s theory that Baker & McKenzie should be liable for failing to protect her from sexual harassment.
 

 We reject the argument that error occurred because the only evidence relevant to Baker & McKenzie’s liability for punitive damages was evidence that Greenstein’s misconduct had been reported to a managing agent. The evidence was that most of the conduct at issue
 
 was
 
 reported to a managing agent or at least had come to the attention of a managing agent before Weeks was hired, and we cannot find unfair prejudice to Baker & McKenzie in the admission of evidence of the few remaining acts of misconduct.
 
 [16]
 
 In short, there was significant evidence that the firm’s managing agents had actual knowledge that Greenstein posed a danger to other employees and was likely to harass Weeks, but that the firm, with conscious disregard for Weeks’s rights and safety, failed to take any reasonable action to prevent that harassment. This evidence was believed by the jury. After reviewing the complete record, we find no likelihood that the jury would have reached a different conclusion had the court excluded evidence relating only to Weeks’s Government Code section 12940, subdivision (i) claims.
 

 In a related argument, Baker & McKenzie contends that the jury must have become confused when both Weeks’s Government Code section 12940,
 
 *1162
 
 subdivision (i) claim, and her claim for punitive damages, were submitted to it. In Baker & McKenzie’s opinion, the jury must have confused the elements of each claim and further confused Weeks’s burden of proof as to each. The court correctly instructed the jury as to the elements of each claim and as to the burden of proof. The special verdict form submitted to the jury echoed the court’s instructions. There is no reason to suppose that the jury was confused, or that it applied the incorrect burden of proof to either claim. Baker & McKenzie cites authority recognizing that instructing the jury on principles not pertinent to issues in the case tends to confuse and mislead the jury. (E.g.,
 
 People
 
 v.
 
 Jackson
 
 (1954) 42 Cal.2d 540, 546-547 [268 P.2d 6];
 
 People
 
 v.
 
 Schultz
 
 (1987) 192 Cal.App.3d 535, 539 [237 Cal.Rptr. 513].) The instructions given the jury here, however,
 
 were
 
 pertinent to an issue in the case—Weeks’s Government Code section 12940, subdivision (i) claim. Although Baker & McKenzie is of the opinion that the claim should not have been submitted to the jury, the simple fact is that it
 
 was
 
 submitted to the jury. The instructions given therefore were in fact pertinent to an issue in the case, and the potential for confusion recognized by the cited authorities did not exist. Finally, Baker & McKenzie, which not only failed to request clarifying instructions but stipulated to those given, is in no position to claim that the instructions failed adequately to distinguish between the evidence necessary to support each of Weeks’s claims. “
 
 [1]
 
 “[I]f the court gives an instruction correct in law, but the party complains that it is too general, lacks clarity, or is incomplete, he must request the
 
 additional or qualifying instruction
 
 in order to have the error reviewed.” ’ ”
 
 (Dor sic
 
 v.
 
 Kurtin
 
 (1971) 19 Cal.App.3d 226, 239 [96 Cal.Rptr. 528]; and see
 
 Finn
 
 v.
 
 G.D. Searle & Co.
 
 (1984) 35 Cal.3d 691, 701-702 [200 Cal.Rptr. 870, 677 P.2d 1147].)
 

 Greenstein also complains that evidence of his conduct with other female employees should not have been introduced, contending that this evidence could not be admitted to prove his conduct in relation to Weeks. (See Evid. Code, § 1101, subd. (a).) The evidence of Greenstein’s prior conduct, however, was not admitted for that purpose. It was admitted, in part, to establish Baker & McKenzie’s liability for punitive damages. It also was admissible to establish Greenstein’s liability for punitive damages, i.e., that he acted with oppression or malice. (Civ. Code, § 3294, subd. (a).) Evidence of past actions may be admitted to prove some fact such as motive, intent, plan, knowledge or absence of mistake or accident. (Evid. Code, § 1101, subd. (b).) Civil Code section 3294 defines “malice” for purposes of punitive damages liability as “conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others.” (Civ. Code, § 3294, subd. (c)(1).) “Oppression” is defined as “despicable conduct that subjects a person to cruel and unjust hardship in
 
 *1163
 
 conscious disregard of that person’s rights.” (Civ. Code, § 3294, subd. (c)(2).) Evidence of Greenstein’s past conduct, and that he had been warned or reprimanded as a result of that conduct, tended to prove that he was fully aware that similar conduct would cause injury, and acted either with the intent to cause injury or with a willful and conscious disregard of Weeks’s rights. In addition, the court consistently instructed the jury throughout the trial that evidence of Greenstein’s prior conduct should not be considered by them in deciding Greenstein’s liability. The court further instructed the jury at the close of trial that any evidence, admitted for a limited purpose could not be considered by them as to any other purpose. We presume the jury followed the court’s instructions. For all of the above reasons we find no likelihood that Greenstein was unfairly prejudiced by the evidence.
 

 Finally, we do not consider if Greenstein was unfairly prejudiced by the argument of Weeks’s counsel that the jury could consider evidence of Greenstein’s prior conduct to determine if Greenstein acted as Weeks claimed. Greenstein did not object to counsel’s comment. “ ‘Generally a claim of misconduct is entitled to no consideration on appeal unless the record shows a timely and proper objection
 
 and a request that the jury be admonished.
 
 ... In the absence of a timely objection the offended party is deemed to have waived the claim of error through his participation in the atmosphere which produced the claim of prejudice.’ ”
 
 (Whitfield
 
 v.
 
 Roth
 
 (1974) 10 Cal.3d 874, 891-892 [112 Cal.Rptr. 540, 519 P.2d 588], italics added, quoting from
 
 Horn
 
 v.
 
 Atchison T. & S. F. Ry. Co.
 
 (1964) 61 Cal.2d 602, 610 [39 CaLRptr. 721, 394 P.2d 561].)
 

 V.
 

 Other Evidence
 

 Greenstein complains that the jury heard evidence of conduct directed by him towards Weeks that, while offensive, cannot in his opinion be deemed sexually offensive. For example, there was evidence that Greenstein looked in Weeks’s mouth to see her teeth, ate off her plate, disparaged the quality of her work and questioned her intelligence. This conduct, although not overtly sexual in nature, is colored by Greenstein’s other clearly sexual conduct and, so colored, itself takes on an appearance of sexually offensive conduct. In all events the jury properly was instructed on the definition of sexual harassment, and we find no likelihood that the jury would have reached a different verdict had this evidence been excluded.
 

 Greenstein also argues prejudice in that the jury was permitted to hear that he had engaged in “serious professional misconduct.” This phrase arose in
 
 *1164
 
 connection with Baker & McKenzie’s attempt to show that it had not ratified Greenstein’s actions. Baker & McKenzie sought to show that the firm forced Greenstein to resign after it became convinced that he lacked credibility and probably was not telling the truth when he denied having committed acts of sexual harassment. Baker & McKenzie therefore wished to show that it severed its relationship with Greenstein after learning that he had backdated legal documents. Greenstein sought to exclude any evidence of backdating on the grounds that it was collateral to any issue at trial, had no tendency to prove that he had committed the acts of sexual harassment and would unfairly prejudice him in the eyes of the jury. Greenstein further pointed out that any witnesses questioned about the backdating could be expected to respond by asserting the Fifth Amendment right against self-incrimination. Greenstein suggested that if the court determined that the reasons for his resignation should be admitted, the parties should enter into a stipulated statement about those reasons and avoid the introduction of evidence irrelevant to any issue not validly before the jury. The trial court ruled that evidence of the reasons for Greenstein’s resignation might be admitted for the limited purpose of proving the state of mind of Baker & McKenzie when it parted ways with Greenstein. The court agreed with Greenstein that the jury need not hear that he had been accused of backdating documents, but because of the importance of the issue to Baker & McKenzie, permitted the parties to refer to Greenstein’s “serious professional misconduct” as a factor in his resignation.
 

 Greenstein complains that evidence of the reasons for his resignation was not admissible to attack his credibility, and that reference to “serious professional misconduct” was more damaging to him than would have been reference to backdating. The short answer to the first complaint is that the evidence was not introduced to attack Greenstein’s credibility. It was introduced in support of Baker & McKenzie’s claim that it did not ratify Greenstein’s conduct. As to the second complaint, the phrase “serious professional misconduct” was introduced as an accommodation to Green-stein, which he certainly could have forgone had he preferred the jury to hear evidence that he had backdated documents.
 

 VI.
 

 Instruction on Clear and Convincing Evidence
 

 In connection with the issue of punitive damages, the court instructed the jury with BAJI No. 2.62 (8th ed. 1994 bound vol.), that “[c]lear and convincing evidence means evidence of such convincing force that it demonstrates, in contrast to the opposing evidence, a high probability of the truth
 
 *1165
 
 of the facts for which it is offered as proof. Such evidence requires a higher standard of proof than proof by a preponderance of the evidence.” Baker & McKenzie contends that the court erred in denying its request to modify the instruction to include language that “the evidence must be so clear as to leave no substantial doubt. It must be sufficiently strong to command the unhesitating assent of every reasonable mind.” The language proposed by Baker & McKenzie appears in
 
 In re Angelia P.
 
 (1981) 28 Cal.3d 908, 919 [171 Cal.Rptr. 637, 623 P.2d 198]: “ ‘Clear and convincing’ evidence requires a finding of high probability. This standard is not new. We described such a test, 80 years ago, as requiring that the evidence be ‘ “so clear as to leave no substantial doubt”; “sufficiently strong to command the unhesitating assent of every reasonable mind.” ’
 
 (Sheehan
 
 v.
 
 Sullivan
 
 (1899) 126 Cal. 189, 193 [58 P. 543].) It retains validity today.” BAJI No. 2.62 has been criticized as an overabbreviation of this language. The Second Appellate District, in
 
 In re Marriage of Weaver
 
 (1990) 224 Cal.App.3d 478, 487 [273 Cal.Rptr. 696], stated at footnote 8: “[BAJI No. 2.62] appears to be an editing of the accepted full definition of the ‘clear and convincing’ standard and is both misleading and unnecessarily limited. Indeed, it seems to suggest an evidentiary test which is significantly less rigorous than the one which the Supreme Court has repeatedly characterized as requiring evidence which is ‘clear, explicit, and unequivocal,’ ‘so clear as to leave no substantial doubt’ and ‘ “ ‘sufficiently strong to command the unhesitating assent of every reasonable mind.’ ” ’ [Citations.]” (See also
 
 Mock
 
 v.
 
 Michigan Millers Mutual Ins. Co.
 
 (1992) 4 Cal.App.4th 306, 332-333, fn. 29 [5 Cal.Rptr.2d 594];
 
 DuBarry Intemat., Inc.
 
 v.
 
 Southwest Forest Industries, Inc.
 
 (1991) 231 Cal.App.3d 552, 566, fn. 19 [282 Cal.Rptr. 181]—both also decided by the Second Appellate District.) No case, however, has found that the use of BAJI No. 2.62 is so misleading as to require reversal. Indeed, the Second Appellate District recently revisited the point as part of a thoughtful discussion in
 
 Mattco Forge, Inc.
 
 v.
 
 Arthur Young & Co.
 
 (1997) 52 Cal.App.4th 820 [60 Cal.Rptr.2d 780]. It concluded that cases such as
 
 In re Angelia P.
 
 do not require the proposed modification, and that absent some additional mandate from the Supreme Court or the Legislature, BAJI No. 2.62 remains a correct instruction.
 
 (Mattco Forge, Inc.
 
 v.
 
 Arthur Young & Co., supra,
 
 52 Cal.App.4th at pp. 847-850; and see also
 
 Roberts
 
 v.
 
 Ford Aerospace & Communications Corp., supra,
 
 224 Cal.App.3d at p. 804.) We agree.
 

 VII.
 

 Punitive Damages
 

 The jury assessed punitive damages of $6.9 million against Baker & McKenzie. The court later denied Baker & McKenzie’s motion for a new
 
 *1166
 
 trial after Weeks agreed to a reduction in that amount to $3.5 million. Baker & McKenzie contends the award against it was excessive even after it was reduced.
 

 Under settled principles, “. . . our review of punitive damage awards rendered at the trial level is guided by the ‘historically honored standard of reversing as excessive only those judgments which the entire record, when viewed most favorably to the judgment, indicates were rendered as the result of passion and prejudice. . . .’ [Citation].”
 
 (Neal
 
 v.
 
 Farmers Ins. Exchange
 
 (1978) 21 Cal.3d 910, 927 [148 Cal.Rptr. 389, 582 P.2d 980].) As we noted earlier, the purpose and function of punitive damages is to punish wrongdoing and thereby protect the public from future misconduct, either by the same defendant or by other potential wrongdoers.
 
 (Adams
 
 v.
 
 Murakami, supra,
 
 54 Cal.3d at p. 110;
 
 Neal
 
 v.
 
 Farmers Ins. Exchange, supra,
 
 21 Cal.3d at p. 928, fn. 13.) In determining whether an award is excessive the courts apply three criteria grounded in that purpose and function: (1) the particular nature of the defendant’s acts in light of the whole record, (2) the amount of compensatory damages awarded, and (3) the wealth of the defendant.
 
 (Neal
 
 v.
 
 Farmers Ins. Exchange, supra,
 
 21 Cal.3d at p. 928.) The key question is whether the amount of damages awarded exceeds the level necessary to properly punish and deter.
 
 (Adams
 
 v.
 
 Murakami, supra,
 
 54 Cal.3d at p. 110.) Thus, “. . . the function of deterrence . . . will not be served if the wealth of the defendant allows him to absorb the award with little or no discomfort. [Citations.] By the same token, of course, the function of punitive damages is not served by an award which, in light of the defendant’s wealth and the gravity of the particular act, exceeds the level necessary to properly punish and deter.”
 
 (Neal
 
 v.
 
 Farmers Ins. Exchange, supra,
 
 21 Cal.3d at p. 928.)
 

 Applying the relevant criteria here, we cannot conclude that the award of punitive damages was excessive. To be sure, the amount awarded was 70 times greater than the compensatory damages award. In
 
 Neal
 
 v.
 
 Farmers Ins. Exchange,
 
 however, the court upheld a punitive damages award that was 74 times greater than the amount of compensatory damages awarded ($740,000 punitive damages and $10,000 compensatory damages). It has been recognized that punitive damages awards generally are not permitted to exceed 10 percent of the defendant’s net worth.
 
 (Storage Services
 
 v.
 
 Oosterbaan
 
 (1989) 214 Cal.App.3d 498, 515 [262 Cal.Rptr. 689].)
 
 [17]
 
 Three and one-half million dollars was 5 percent of Baker & McKenzie’s net worth. It also is true, as Baker & McKenzie asserts, that the trial court found Baker & McKenzie’s culpability to have been mitigated by
 
 *1167
 
 a number of factors such as Greenstein’s insistence when questioned that he had not committed the conduct charged against him and the firm’s insistence that he undergo sensitivity counseling after his harassment of Weeks. These factors certainly supported the trial court’s decision to reduce the award from 10 to 5 percent of Baker & McKenzie’s net worth, but we do not see that they mandated a further reduction. Finally, we are not persuaded that the award should have been reduced because of the evidence that Baker & McKenzie has “learned its lesson,” and thus will be deterred from like conduct in the future. Limiting an award because of a defendant’s contrition certainly encourages contrition. It also, however, reduces the risk that serious consequences will result from failing to prevent the wrongful conduct in the first place. Limiting an award because of a defendant’s contrition therefore undermines the purpose of punitive damages.
 

 We also reject Baker & McKenzie’s argument that the award of punitive damages violates due process. The ultimate question under the federal due process clause is one of reasonableness, a question that turns on “(1) the harm inflicted on the plaintiff; (2) the reprehensibility of the defendant’s conduct; (3) the likely potential harm to others arising from the complained of conduct; and (4) the wealth of the defendant.”
 
 (Pulla
 
 v.
 
 Amoco Oil Co.
 
 (8th Cir. 1995) 72 F.3d 648, 658-659.) The balance struck here, based on similar factors, was reasonable and well within accepted parameters.
 

 For all of the above reasons we also reject Greenstein’s contention that the award of $225,000 in punitive damages against him was excessive. That amount was less than five times the amount of the compensatory damages award. Greenstein’s actions were reprehensible. Finally, although $225,000 slightly exceeds 10 percent of Greenstein’s net worth (stipulated to be $2 million), there is no evidence that payment of that sum will bankrupt him or cause him such undue hardship as to render his punishment unreasonably disproportionate to his ability to pay. (See
 
 Adams
 
 v.
 
 Murakami, supra,
 
 54 Cal.3d at pp. 111-112.)
 

 VIII.
 

 Juror Misconduct
 

 Baker & McKenzie moved for a new trial on the grounds of juror misconduct. In support of this argument, Baker & McKenzie submitted evidence that one juror’s wife had been a plaintiff in a consolidated class action brought against Bechtel Corporation for sex discrimination and, in
 
 *1168
 
 fact, had received $7,340.14 in settlement of her claim. One of Weeks’s attorneys, Alan Exelrod, had represented the class in that action. This juror, however, had not responded when, during voir dire, the prospective jurors were asked if anyone close to any of them ever had been sexually harassed or subjected to any type of discrimination in the workplace, or if any of them or anyone close to any of them had made any type of claim for damages. The juror also did not inform the court that he or his wife had had any prior contact with Attorney Exelrod. The trial court denied Baker & McKenzie any relief for juror misconduct, finding that the juror’s nondisclosures had not deprived Baker & McKenzie of a fair trial.
 

 The applicable legal principles of review were summarized in
 
 English
 
 v.
 
 Lin
 
 (1994) 26 Cal.App.4th 1358,1364 [31 Cal.Rptr.2d 906]: “ ‘ “It is well settled that a presumption of prejudice arises from
 
 any
 
 juror misconduct. . . . However, the presumption may be rebutted by proof that no prejudice actually resulted.” ’ [Citation.]
 
 [1]
 
 “A denial of a motion for new trial grounded on jury misconduct implies a determination by the trial judge that the misconduct did not result in prejudice.” ’ [Citation.] ‘ “In reviewing the denial of a motion for new trial based on jury misconduct, the appellate court ‘has a constitutional obligation [citation] to review the entire record, including the evidence, and to determine independently whether the act of misconduct, if it occurred, prevented the complaining party from having a fair trial.’ . . .” ’ [Citation.] We ‘must examine the record to determine whether there is a reasonable probability of actual harm to the complaining party resulting from the misconduct. Some of the factors to be considered in this connection are “the strength of the evidence that misconduct occurred, the nature and seriousness of the misconduct, and the probability that actual prejudice may have ensued.” ’ [Citation.]” (See also
 
 Hasson
 
 v.
 
 Ford Motor Co.
 
 (1982) 32 Cal.3d 388, 417 [185 Cal.Rptr. 654, 650 P.2d 1171].)
 

 The evidence here is that the juror’s wife had been one of some 400 class plaintiffs in a 1981 action. She was not a named plaintiff in that case, and there is no evidence that she was in any way an active participant in it. The action was for employment discrimination in hiring, promotion and pay. Sexual harassment was not an issue. The juror submitted an affidavit in which he declared that he did not respond to the voir dire questions because his wife had not made any claim for sexual harassment and he did not hear or understand that information relating to sexual discrimination claims had been solicited. He believed that his wife had been awarded backpay, which he did not understand to be “damages.” He was not aware that Attorney Exelrod had been involved in his wife’s case. Other jurors submitted affidavits that the juror never mentioned his wife’s case during deliberations.
 

 This evidence does not disclose juror misconduct. We, like the trial court, find that although a presumption of juror misconduct may have been raised
 
 *1169
 
 by Baker & McKenzie’s evidence, the evidence offered by Weeks, excluding evidence inadmissible under Evidence Code section 1150, subdivision (a),
 
 [18]
 
 revealed that there was no resulting prejudice. The record reflects that the juror simply was unaware of Attorney Exelrod’s connection to his wife’s case, and that he did not understand that the voir dire questions required a response from him. The record further provides no basis for assuming that the juror’s experience with his wife’s case for discrimination in hiring, promotion or pay had any effect on his view of the present case for sexual harassment.
 

 IX.
 

 Attorney Fees
 

 The trial court ruled that Weeks was entitled to attorney fees under both California’s “private attorney general” statute, Code of Civil Procedure section 1021.5, and Government Code section 12965, subdivision (b). In calculating the amount of fees the court first established a reasonable hourly fee per legal professional. The court multiplied that fee by the number of hours reasonably expended by each legal professional in prosecuting the action, as follows:
 

 Phillip Kay 2,252.5 hours x $250 = $563,125
 

 Alan Exelrod 1,104.1 hours x $300 = $331,230
 

 Robin Peluso
 
 [19]
 
 272.1 hours x $100 = $ 27,210
 

 921,565
 

 The court enhanced this sum by multiplying it by a factor of 1.7, to reach $1,566,660.50. The court added $166,510.50 as the amount of fees expended in obtaining the fee award and $114,266.86 incurred as expenses. The full amount awarded, therefore, was $1,847,437.86.
 

 Neither Baker & McKenzie nor Greenstein argues that the court erred in determining that fees were available. Neither contests the number of
 
 *1170
 
 hours found by the court to have been reasonably expended by Weeks’s legal team nor the lodestar amounts for each member of the team. Each contends, however, that the court erred in enhancing the fees awarded by means of the 1.7 multiplier.
 

 We recently determined that Code of Civil Procedure section 1021.5
 
 [20]
 
 does not authorize an award of fees in cases such as this. In
 
 Flannery
 
 v.
 
 California Highway Patrol
 
 (1998) 61 Cal.App.4th 629 [71 Cal.Rptr.2d 632] the plaintiff brought an action against the California Highway Patrol for harassment and wrongful termination. As here, the trial court awarded the plaintiff attorney fees under both Code of Civil Procedure section 1021.5 and the FEHA. We held that section 1021.5 does not authorize an award of fees when the record indicates that the primary effect of a lawsuit was to advance or vindicate the plaintiff’s personal economic interest. “ ‘Section 1021.5 was not designed as a method for rewarding litigants motivated by their own pecuniary interests who only coincidentally protect the public interest.’
 
 (Beach Colony II
 
 v.
 
 California Coastal Com.
 
 (1985) 166 Cal.App.3d 106, 114 [212 Cal.Rptr. 485].) ‘Instead, its purpose is to provide some incentive for the plaintiff who acts as a true private attorney general, prosecuting a lawsuit that enforces an important public right and confers a significant benefit, despite the fact that his or her own financial stake in the outcome would not by itself constitute an adequate incentive to litigate.’
 
 (Satrap
 
 v.
 
 Pacific Gas & Electric Co.
 
 (1996) 42 Cal.App.4th 72, 80 [49 Cal.Rptr.2d 348].)”
 
 (Flannery
 
 v.
 
 California Highway Patrol, supra,
 
 61 Cal.App.4th at p. 635.) In so holding, we rejected the argument that a private action brought by a plaintiff for her own pecuniary benefit conferred a significant benefit on the public simply because it “sent a message to the CHP and other government agencies that sexual discrimination, sexual harassment, and retaliation in violation of the FEHA will not be tolerated.”
 
 (Id.
 
 at p. 636.) The same rationale applies here. The notoriety of this case may have brought the issue of sexual harassment in employment into the public eye, and the verdict may have sent the message that sexual harassment in the workplace will not be tolerated; however, this action was
 
 *1171
 
 brought not to benefit the public, but as a means of vindicating Weeks’s own personal rights and economic interest.
 

 Although fees are not available under Code of Civil Procedure section 1021.5, they are available under the FEHA. Government Code section 12965, subdivision (b) thus provides, in part, that in actions brought by a claimant for an unlawful employment practice, “. . . the court, in its discretion may award to the prevailing party reasonable attorney fees and costs except where such action is filed by a public agency or a public official, acting in an official capacity.” The trial court accordingly had discretion to award Weeks attorney fees. In
 
 Flannery,
 
 we held that the same factors which led the court to award fees may not also be used as justification for enhancing the fee award. The trial court here, unlike the court in
 
 Flannery,
 
 used different factors; however, the mere existence of the enumerated factors does not in and of itself justify enhancing an award that already grants the legal professionals a reasonable hourly rate for every hour reasonably devoted to the litigation of the case. Rather, the factors must be analyzed not only in light of the policies they seek to advance, but also in light of the policies against litigation of claims for some purpose other than the worthiness of the cause or the need to redress the injury at issue.
 

 Fee enhancements by means of multipliers or otherwise are well recognized in California. (E.g.,
 
 Serrano
 
 v.
 
 Priest
 
 (1977) 20 Cal.3d 25 [141 Cal.Rptr. 315, 569 P.2d 1303]
 
 (Serrano
 
 7/1);
 
 Beasley
 
 v.
 
 Wells Fargo Bank
 
 (1991) 235 Cal.App.3d 1407 [1 Cal.Rptr.2d 459];
 
 City of Oakland
 
 v.
 
 Oakland Raiders
 
 (1988) 203 Cal.App.3d 78 [249 Cal.Rptr. 606];
 
 Kern River Public Access Com.
 
 v.
 
 City of Bakersfield
 
 (1985) 170 Cal.App.3d 1205 [217 Cal.Rptr. 125].) Under California law, the trial court begins by fixing a “lodestar” or “touchstone” reflecting a compilation of the time spent and reasonable hourly compensation of each attorney or legal professional involved in the presentation of the case. The court then adjusts this figure in light of a number of factors that militate in favor of augmentation or diminution.
 
 (Serrano III,
 
 20 Cal.3d at pp. 48-49.)
 
 [21]
 
 The purpose of a fee enhancement is not to reward attorneys for litigating certain kinds of cases,
 
 *1172
 
 but to fix a reasonable fee in a particular action. Government Code section 12965, subdivision (b) thus authorizes an award of
 
 reasonable
 
 attorney fees, not an award of reasonable fees plus an enhancement. Nonetheless, it is recognized that some form of fee enhancement may be appropriate and necessary to attract competent representation of cases meriting legal assistance. In
 
 Press
 
 v.
 
 Lucky Stores, Inc.
 
 (1983) 34 Cal.3d 311, 322 [193 Cal.Rptr. 900, 667 P.2d 704], California’s Supreme Court implicitly found that it would be appropriate to enhance an award by means of a multiplier “ ‘to reflect the broad public impact of the results obtained and to compensate for the high quality of work performed and the contingencies involved in undertaking this litigation.’ ” This does not mean, however, that the trial courts should enhance the lodestar figure in every case of uncertain outcome or where the work performed was of high quality. The challenge to the trial courts is to make an award that provides fair compensation to the attorneys involved in the litigation at hand and encourages litigation of claims that in the public interest merit litigation, without encouraging the unnecessary litigation of claims of little public value.
 

 One approach might be to use the lodestar method of fee calculation only in cases that meet the criteria for an award of fees under Code of Civil Procedure section 1021.5, and thus necessarily enforce an important right affecting the public interest. This approach, however, has not been followed. The lodestar method for calculating fee awards thus has been adopted not only in section 1021.5 cases, but in inverse condemnation cases (e.g.,
 
 City of Oakland
 
 v.
 
 Oakland Raiders, supra,
 
 203 Cal.App.3d at p. 83;
 
 Salton Bay Marina, Inc.
 
 v.
 
 Imperial Irrigation Dist.
 
 (1985) 172 Cal.App.3d 914, 952-958 [218 Cal.Rptr. 839]), in at least one case awarding fees in a contract action pursuant to Civil Code section 1717
 
 (Stemwest Corp.
 
 v.
 
 Ash
 
 (1986) 183 Cal.App.3d 74 [227 Cal.Rptr. 804]) and in a case brought under the Political Reform Act of 1974 (Gov. Code, § 81000 et seq.)
 
 (Downey Cares
 
 v.
 
 Downey Community Development Com.
 
 (1987) 196 Cal.App.3d 983, 993-996 [242 Cal.Rptr. 272]). The lodestar method has been applied in an action brought under the FEHA
 
 (Crommie
 
 v.
 
 State of Cal., Public Utilities Com’n.
 
 (N.D.Cal. 1994) 840 F.Supp. 719, 724, affd. in
 
 Mangold
 
 v.
 
 California Public Utilities Com’n
 
 (9th Cir. 1995) 67 F.3d 1470).
 
 [22]
 

 A second approach, adopted by federal law, is to enhance the lodestar figure only in exceptional cases. The United States Supreme Court thus has
 
 *1173
 
 identified a strong presumption that the product of reasonable hours times a reasonable rate represents a reasonable fee, and has held that in most cases this rate should not be enhanced: “[Fee-shifting] statutes were not designed as a form of economic relief to improve the financial lot of attorneys, nor were they intended to replicate exactly the fee an attorney could earn through a private fee arrangement with his client. Instead, the aim of such statutes was to enable private parties to obtain legal help in seeking redress for injuries resulting from the actual or threatened violation of specific federal laws. Hence, if plaintiffs . . . find it possible to engage a lawyer based on the statutory assurance that he will be paid a ‘reasonable fee,’ the purpose behind the fee-shifting statute has been satisfied, [¶] Moreover, when an attorney first accepts a case and agrees to represent the client, he obligates himself to perform to the best of his ability and to produce the best possible results commensurate with his skill and his client’s interests. Calculating the fee award in a manner that accounts for these factors, either in determining the reasonable number of hours expended on the litigation or in setting the reasonable hourly rate, thus adequately compensates the attorney, and leaves very little room for enhancing the award based on his postengagement performance. In short, the lodestar figure includes most, if not all, of the relevant factors constituting a ‘reasonable’ attorney’s fee, and it is unnecessary to enhance the fee ... in order to serve the statutory purpose of enabling plaintiffs to secure legal assistance.”
 
 (Pennsylvania
 
 v.
 
 Del. Valley Citizens’ Council
 
 (1986) 478 U.S. 546, 565-566 [106 S.Ct. 3088, 3098, 92 L.Ed.2d 439].)
 

 As we discussed in
 
 Flannery
 
 v.
 
 California Highway Patrol, supra,
 
 61 Cal.App.4th 629, California does not follow the approach to fee awards adopted by the federal courts. Therefore, although there is appeal in the high court’s finding that many of the factors commonly used to enhance a lodestar figure more properly are considered in determining the lodestar figure at the outset, under present California law the relevant factors are considered only after the lodestar figure has been determined, and are used to augment or diminish it.
 
 (Id.
 
 at p. 644.) As a result, an upward or downward adjustment from the lodestar figure will be far more common under California law than under federal law. Nonetheless, the ultimate goal in California, as under federal law, still is to determine a “reasonable” attorney fee, and not to encourage unnecessary litigation of claims that serve no public purpose either because they have no broad public impact or because they are factually or legally weak.
 

 The classic situation justifying an upward adjustment of the lodestar figure was seen in the
 
 Serrano
 
 cases
 
 (Serrano
 
 v.
 
 Priest
 
 (1971) 5 Cal.3d 584 [96 Cal.Rptr. 601, 487 P.2d 1241, 41 A.L.R.3d 1187]
 
 (Serrano I), Serrano
 
 v.
 
 *1174
 

 Priest
 
 (1976) 18 Cal.3d 728 [135 Cal.Rptr. 345, 557 P.2d 929]
 
 (,Serrano II)
 
 and
 
 Serrano III, supra,
 
 20 Cal.3d 25). The litigation there revolved around California’s system for financing public schools. The plaintiffs succeeded in overturning the existing system, obtaining an order that it be replaced by a system designed to provide an equitable distribution of state funds between all public schools. The litigation resulted in no fund of money from which attorney fees might be paid, nor did it result in any monetary recovery by the plaintiffs. The plaintiffs were under no obligation to pay their attorneys for their efforts. It appears that the attorneys did, however, receive some funding from charities or public sources for the purposes of prosecuting cases of the character involved in that action—a factor the court found to be relevant in determining the size of an award of fees.
 
 (Serrano III, supra,
 
 20 Cal.3d at p. 49, fn. 24.) Finally, an award of fees was uncertain not only because of the complexity and difficulty of the legal issues involved, but because there was no clear statutory authority for shifting attorney fees to the defendant. In contrast, the present case is in essence a personal injury action, brought by a single plaintiff to recover her own economic damages. Weeks and her attorneys had a fee agreement by which her attorneys were assured of a portion of any recovery.
 
 [23]
 
 In addition, because of the availability of attorney fees under the FEHA, the attorneys had reason to assume that the amount of Weeks’s recovery would not limit the amount of fees they ultimately received. Thus, the risk that Weeks’s attorneys would not be compensated for their work was no greater than the risk of loss inherent in any contingency fee case; however, because of the availability of statutory fees the possibility of receiving full compensation for litigating the case was greater than that inherent in most contingency fee actions.
 

 In enhancing the lodestar figure the trial court applied a number of the factors discussed by the court in
 
 Serrano III.
 
 The trial court thus found an upward adjustment to be warranted by the contingent nature of the award, the difficulty of the litigation, the skill displayed in conducting it, the amounts involved and the results obtained, the fact that Weeks’s attorneys had turned down other cases in order to represent Weeks and the delay in receiving payment. The application of these factors must be analyzed in light of the underlying purpose of fee awards—to encourage litigation of certain kinds of claims—but also in light of the danger of encouraging litigation of
 
 *1175
 
 claims of dubious merit from either an individual or a public policy point of view.
 

 Looking first to the contingent nature of the award, as has already been discussed, the situation here is unlike that in the
 
 Serrano
 
 cases, where it was uncertain that the attorneys would be entitled to an award of fees even if they prevailed. Government Code section 12965, subdivision (b) created a reasonable expectation that attorney fees would not be limited by the extent of Weeks’s recovery and that Weeks’s attorneys would receive full compensation for their efforts. The contingent nature of the litigation, therefore, was the risk that Weeks would not prevail. Such a risk is inherent in any contingency fee case and is managed by the decision of the attorney to take the case and the steps taken in pursuing it. When the public value of the case is great and the risk of loss results from the complexity of the litigation or the uncertainty of the state of the law, fee enhancement may be proper. Fee enhancement, however, should not be a tool that encourages litigation of claims where the actual injury to the plaintiff was slight. It should not compel a defendant to settle frivolous claims under threat that the weaker the claim the more likely it is that any fees awarded will be enhanced should the plaintiff manage to prevail. We do not intend to imply that Weeks’s claim lacked factual or legal merit, although we do note that the jury concluded that her damages were not overwhelming. We do, however, mean to urge caution in awarding enhanced fees, particularly in private actions, that will then encourage future litigation of questionable claims.
 

 As to the factor of novelty or difficulty of litigation, the trial court found that litigation was difficult not because of the novelty or complexity of the issues,
 
 [24]
 
 but because of the inherent difficulty of proving sexual harassment. “Witnesses to harassing conduct are rare, issues of credibility abound, victims are often reluctant to testify, damages are difficult to quantify, and settlements frequently are difficult to obtain.” This statement is, of course, correct. As the court also noted, however, the same will be true for many sexual harassment actions. Indeed, it often will be true for other claims of harassment or discrimination in the workplace. Other factors cited by the court, such as delay in payment or turning down other cases in order to litigate this action, also are factors common to many cases. There is at least partial compensation for these problems, however, in the availability of statutory attorney fees. In addition, because Government Code section 12965 permits the court to award reasonable fees, and does not limit fees to a percentage of the plaintiff’s recovery, the attorney who takes such a case can
 
 *1176
 
 anticipate receiving full compensation for every hour spent litigating a claim against even the most polemical opponent.
 

 As to the skill of the attorneys in litigating the case, that factor necessarily is reflected in the lodestar figure. The more skillful and experienced the attorney the higher his or her hourly charges will be. It follows that the skill of an attorney will justify enhancing the lodestar figure only if the skills exhibited are beyond those that might be expected of attorneys of comparable expertise or experience. This case, as litigated in the trial court, did not involve novel or complex legal issues. The attorneys were not required to demonstrate skills above and beyond those that would be expected of persons of their stature and experience.
 

 As the trial court found, the factor of amounts involved and results obtained militate
 
 against
 
 enhancing the fee award. The amount of compensatory damages actually awarded was relatively modest. The amount obtained was extraordinary because of the substantial award of punitive damages. Such damages have been characterized as a “windfall”
 
 (Adams
 
 v.
 
 Murakami, supra,
 
 54 Cal.3d at p. 120;
 
 Rosener
 
 v.
 
 Sears, Roebuck & Co.
 
 (1980) 110 Cal.App.3d 740, 750 [168 Cal.Rptr. 237]), and do not justify enhancement of attorney fees. The purpose of a fee award is not to punish the defendant, but to ensure that the plaintiff will be fully compensated and will not have to bear the expense of litigation. (See
 
 Washburn
 
 v.
 
 City of Berkeley
 
 (1987) 195 Cal.App.3d 578, 587 [240 Cal.Rptr. 784].) When the plaintiff receives a substantial punitive damages award, that purpose is fulfilled. Enhancement may be appropriate when an attorney who obtained a significant result otherwise would receive but meager compensation. Where the attorney will be fully compensated for his or her efforts, however, the fact that the client receives a windfall in the form of punitive damages neither justifies paying the attorney an increased amount nor exacting an increased amount from the defendant. The fact that Weeks obtained a substantial award of punitive damages, therefore, does not support enhancement of the fee award.
 

 Although we find that the award of fees in the first instance was proper, we cannot find sufficient public or private reason in the factors cited by the trial court for the use of a multiplier of 1.7 in this case. Since it is well settled that “[t]he ‘experienced trial judge is the best judge of the value of professional services rendered in his court, and while his judgment is of course subject to review, it will not be disturbed unless the appellate court is convinced that it is clearly wrong.’ [Citations.]”
 
 (Serrano III, supra,
 
 20 Cal.3d at p. 49), the order awarding attorney fees is reversed and remanded to the trial court for reconsideration in accordance with the principles discussed in our opinion.
 

 
 *1177
 
 The judgment is affirmed. Weeks is awarded her costs on appeal and is entitled to attorney fees incurred in responding to the appeal.
 

 Strankman, P. J., and Dossee, J., concurred.
 

 A petition for a rehearing was denied June 2, 1998, and appellants’ petition for review by the Supreme Court was denied August 26, 1998. Baxter, J., did not participate therein.
 

 [1]
 

 Baker & McKenzie replied, “There may have been one earlier issue with regard to appropriate behavior in the office. The person in question, at the time, made a specific request that no action be taken and that no records be kept. That request was honored. It is the current recollection that the inquiry related to certain discussions between and among lawyers that were found not to be objectionable by any of the other secretaries or staff members who were in regular day-to-day contact with the environment. After discussion with the person making the inquiry, the claim was withdrawn and there were no further issues or questions raised.”
 

 [2]
 

 Government Code section 12940 provides: “It shall be an unlawful employment practice “(h)(1) For an employer, labor organization, employment agency, apprenticeship training program or any training program leading to employment, or any other person, because of race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, marital status, sex, or age, to harass an employee or applicant. Harassment of an employee or applicant by an employee other than an agent or supervisor shall be unlawful if the entity, or its agents or supervisors, knows or should have known of this conduct and fails to take immediate and appropriate corrective action. An entity shall take all reasonable steps to prevent harassment from occurring. Loss of tangible job benefits shall not be necessary in order to establish harassment.”
 

 [3]
 

 Baker & McKenzie stipulated that it would be liable for compensatory damages under Government Code section 12940, subdivision (h) if the jury found that Greenstein had sexually harassed Weeks.
 

 [4]
 

 Section 7287.6 of title 2 of the California Code of Regulations supplements the FEHA. Subdivision (b)(1) of section 7287.6 defines sexual harassment as including: “(A) Verbal harassment, e.g., epithets, derogatory comments or slurs on a basis enumerated in the Act; “(B) Physical harassment, e.g., assault, impending or blocking movement, or any physical interference with normal work or movement, when directed at an individual on a basis enumerated in the Act;
 
 *1147
 
 “(C) Visual forms of harassment, e.g., derogatory posters, cartoons, or drawings on a basis enumerated in the Act; or “(D) Sexual favors, e.g., unwanted sexual advances which condition an employment benefit upon an exchange of sexual favors. . . . “(E) In applying this subsection, the rights of free speech and association shall be accommodated consistently with the intent of this subsection. “(2) Harassment of an applicant or employee by an employer or other covered entity, its agents or supervisors is unlawful. “(3) Harassment of an applicant or employee by an employee other than those listed in subsection (b)(2) above is unlawful if the employer or other covered entity, its agents or supervisors knows of such conduct and fails to take immediate and appropriate corrective action. Proof of such knowledge may be direct or circumstantial. If the employer or other covered entity, its agents or supervisors did not know but should have known of the harassment, knowledge shall be imputed unless the employer or other covered entity can establish that it took reasonable steps to prevent harassment from occurring. Such steps may include affirmatively raising the subject of harassment, expressing strong disapproval, developing appropriate sanctions, informing employees of their right to raise and how to raise the issue of harassment under California law, and developing methods to sensitize all concerned. “(4) An employee who has been harassed on the job by a co-employee should inform the employer or other covered entity of the aggrievement; however, an employee’s failure to give such notice is not an affirmative defense.”
 

 [5]
 

 Civil Code section 3294 provides in Ml: “(a) In an action for the breach of an obligation not arising from contract, where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant. “(b) An employer shall not be liable for damages pursuant to subdivision (a), based upon acts of an employee of the employer, unless the employer had advance knowledge of the unfitness of the employee and employed him or her with a conscious disregard of the rights or safety of others or authorized or ratified the wrongful conduct for which the damages are awarded or was personally guilty of oppression, fraud, or malice. With respect to a corporate
 
 *1149
 
 employer, the advance knowledge and conscious disregard, authorization, ratification or act of oppression, fraud, or malice must be on the part of an officer, director, or managing agent of the corporation. “(c) As used in this section, the following definitions shall apply: “(1) ‘Malice’ means conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others. “(2) ‘Oppression’ means despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person’s rights. “(3) ‘Fraud’ means an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the intention on the part of the defendant of thereby depriving a person of property or legal rights or otherwise causing injury. “(d) Damages may be recovered pursuant to this section in an action pursuant to Chapter 4 (commencing with Section 377.10) of Title 3 of Part 2 of the Code of Civil Procedure based upon a death which resulted from a homicide for which the defendant has been convicted of a felony, whether or not the decedent died instantly or survived the fatal injury for some period of time. The procedures for joinder and consolidation contained in Section 377.62 of the Code of Civil Procedure shall apply to prevent multiple recoveries of punitive or exemplary damages based upon the same wrongful act. “(e) The amendments to this section made by Chapter 1498 of the Statutes of 1987 apply to all actions in which the initial trial has not commenced prior to January 1, 1988.”
 

 [6]
 

 See also section 213 of the Restatement Second of Agency, including comment d.
 

 [7]
 

 In a September 3, 1980, letter to Governor Edmund G. Brown, Jr., Fred J. Hiestand, counsel for the Association for California Tort Reform, wrote in favor of Senate Bill No. 1989: “. . . SB 1989 provides the first statutory guidance for the imposition of punitive damages against an employer based upon the acts of an employee. Without this law, California courts seem to have adopted the Restatement of Torts 2d, §909, to determine when an employer can be held liable in punitives for an employee’s acts. Yet the Restatement 2d is riddled with problems for every employer. One such problem is the provision in the Restatement which permits a punitive award against an employer for mere negligence (e.g., ‘recklessness’) in employing an ‘unfit’ agent. This places every employer in the position of making a Hobson’s choice between incurring liability in punitive damages for the conduct of employees ‘recklessly’ hired, or incurring liability for not hiring employees on grounds that violate other laws. For example, courts have held that an employer’s use of arrest or conviction records without sufficient job-related justification violates Title VH of the Civil Rights Act of 1964 and adversely impacts on minorities. See, e.g., Gregory v. Litton Systems, Inc., 472 F.2d 631 (9th Cir. 1972). Yet arrest and conviction records are certainly relevant in determining an employee’s fitness or ‘unfitness’ for a job. Query whether it is not, therefore, ‘reckless’ under the Restatement 2d for an employer to fail to search out or inquire about an employee’s arrest and conviction record? SB 1989 seeks to resolve this dilemma for the employer by requiring that, before an employer can be held liable in punitive damages he must have, inter alia, ‘advance knowledge of the unfitness of the employee and employed him with a conscious disregard of the rights or safety of others ... or authorized or ratified the wrongful conduct . . .’ This means the employer cannot be found liable for punitive damages merely because he negligently hired or retained an ‘unfit’ employee, or one with a criminal arrest or conviction record; instead, he must have hired or retained the employee with knowledge of his or her actual unfitness.” (At p. 2.)
 

 [8]
 

 Civil Code section 3295 provides: “(a) The court may, for good cause, grant any defendant a protective order requiring the plaintiff to produce evidence of a prima facie case of liability for damages pursuant to Section 3294, prior to the introduction of evidence of: “(1) The profits the defendant has gained by virtue of the wrongful course of conduct of the nature and type shown by the evidence. “(2) The financial condition of the defendant. “(b) Nothing in this section shall prohibit the introduction of prima facie evidence to establish a case for damages pursuant to Section 3294. “(c) No pretrial discovery by the plaintiff shall be permitted with respect to the evidence referred to in paragraphs (1) and (2) of subdivision (a) unless the court enters an order permitting such discovery pursuant to this subdivision. However, the plaintiff may subpoena documents or witnesses to be available at the trial for the purpose of establishing the profits or financial condition referred to in subdivision (a), and the defendant may be required to identify documents in the defendant’s possession which are relevant and admissible for that purpose and the witnesses employed, by or related to the defendant who would be most competent to testify to those facts. Upon motion by the plaintiff supported by appropriate affidavits and after a hearing, if the court deems a hearing to be necessary, the court may at any time enter an order permitting the discovery otherwise prohibited by this subdivision if the court finds, on the basis of the supporting and opposing affidavits presented, that the plaintiff has established that there is a substantial probability that the plaintiff will prevail on the claim pursuant to Section 3294. Such order shall not be considered to be a determination on the merits of the claim or any defense thereto and shall not be given in evidence or referred to at the trial. “(d) The court shall, on application of any defendant, preclude the admission of evidence of that defendant’s profits or financial condition until after the trier of fact returns a verdict for plaintiff awarding actual damages and finds that a defendant is guilty of malice, oppression, or fraud in accordance with Section 3294. Evidence of profit and financial condition shall be admissible only as to the defendant or defendants found to be liable to the plaintiff and to be guilty of malice, oppression, or fraud. Evidence of profit and financial condition shall be presented to the same trier of fact that found for the plaintiff and found one or more defendants guilty of malice, oppression, or fraud. “(e) No claim for exemplary damages shall state an amount or amounts. “(f) The amendments to this section made by Senate Bill No. 241 of the 1987-88 Regular Session apply to all actions in which the initial trial has not commenced prior to January 1, 1988.”
 

 [9]
 

 As we conclude that a specific finding of employer oppression, fraud or malice is not a prerequisite for an award of punitive damages directly against the employer, we need not and do not decide whether Baker & McKenzie waived the right to make a contrary argument by stipulating to a special verdict form that did not ask the jury to make that determination. (Compare
 
 Myers Building Industries, Ltd.
 
 v.
 
 Interface Technology, Inc.
 
 (1993) 13 Cal.App.4th 949, 959-961 [17 Cal.Rptr.2d 242] with
 
 Mesecher
 
 v.
 
 County of San Diego
 
 (1992) 9 Cal.App.4th 1677, 1685-1687 [12 Cal.Rptr.2d 279].)
 

 [10]
 

 Baker & McKenzie emphasizes the danger to employers of terminating employees who later may be able to show that they did not engage in misconduct, and insists that the question of whether termination was required is a question for the court. In light of this argument we take note of the recent case of
 
 Cotran
 
 v.
 
 Rollins Hudig Hall Internal, Inc.
 
 (1998) 17 Cal.4th 93 [69 Cal.Rptr.2d 900, 948 P.2d 412], although we also find that the case has little direct bearing on the issues before us. The Supreme Court in that case held that an employer may not be found liable for wrongful termination of a for-cause employee if the employer acted in good faith and upon a reasonable belief that good cause for termination existed.
 
 (Id.
 
 at p.
 
 *1157
 
 103.) The court also found that the question of whether the employer acted in good faith is a jury question.
 
 (Ibid.)
 
 Here, the question of whether Baker & McKenzie engaged in behavior justifying the imposition of punitive damages similarly was a question for the jury.
 

 [11]
 

 The Alcohol and Drug Rehabilitation Act, Labor Code sections 1025-1028, requires private employers to make reasonable accommodation not amounting to undue hardship for employees who voluntarily take part in alcohol or drug rehabilitation programs. There is, however, no law requiring an employer to provide counseling to a violent or abusive employee. Nonetheless, as the act indicates, the trend appears to be toward requiring employers to accommodate employees as opposed to simply terminating them.
 

 [12]
 

 Our conclusion makes it unnecessary for us to decide whether the decision in
 
 Fitch
 
 v.
 
 Commission on Judicial Performance
 
 (1995) 9 Cal.4th 552 [37 Cal.Rptr.2d 581, 887 P.2d 937] requires a finding that Baker & McKenzie could have satisfied the duty it owed to its employees by some action short of terminating Greenstein. In
 
 Fitch,
 
 a superior court judge challenged the recommendation of the Commission on Judicial Performance that he be publicly censured for misconduct not unlike Greenstein’s misconduct here. The Supreme Court found that the commission’s findings were supported by clear and convincing evidence, and that the judge’s conduct justified public censure. Baker & McKenzie contends that the opinion stands for the proposition that an employer should not be required to fire a harassing employee in order to avoid liability under Civil Code section 3294. We question whether
 
 Fitch
 
 stands for that proposition, but because we essentially agree with it, we need not pursue the matter further.
 

 [13]
 

 Indeed, the language of Government Code section 12940, subdivision (i) would permit an award of compensatory damages whether or not the employer has reason to believe that harassment is or might be occurring. For example, an employer might be held liable if, having no special reason to believe that harassment might actually occur, it fails to post anti-harassment information or develop procedures for dealing with harassment. (But see
 
 Doe
 
 v.
 
 Capital Cities
 
 (1996) 50 Cal.App.4th 1038, 1053-1054 [58 Cal.Rptr.2d 122].)
 

 [14]
 

 In so concluding, we find it unnecessary to determine whether the evidence supports the further, alternative finding that Baker & McKenzie ratified Greenstein’s conduct.
 

 [15]
 

 Authority for this contention exists in
 
 Armenia
 
 v.
 
 Churchill
 
 (1954) 42 Cal.2d 448, 457-458 [267 P.2d 303], where it was held that the trial court properly sustained the defendant’s objection to evidence tending to show negligence in hiring a driver after the defendant stipulated that the driver was her agent. By so stipulating the defendant removed from the case the issue of her legal liability for the tort.
 

 [16]
 

 Baker & McKenzie cites the evidence of Greenstein’s conduct towards Elyce Zahn, Donna Blow and Julie Haydock-Davis. Greenstein’s conduct towards Zahn was reported to Mary Contreras, but there was no evidence that Contreras reported it to anyone else. Greenstein’s conduct towards Blow also was reported to Contreras who stated that she would speak to the administrative partner, Bill Atkin, about it. The evidence thus includes the inference that Bill Atkin did in fact learn of the conduct. Similarly, Contreras reported Greenstein’s conduct towards Haydock-Davis to various persons on Baker & McKenzie’s administrative committee, which, in turn, asked John McKenzie to speak about it to Greenstein.
 

 [17]
 

 See the appendix to
 
 Devlin
 
 v.
 
 Kearny Mesa AMC/Jeep/Renault, Inc.
 
 (1984) 155 Cal.App.3d 381, 393-396 [202 Cal.Rptr. 204], for a sampling of California punitive damages
 
 *1167
 
 awards confirming that the award here is well within the norm as to the relationship between the award of compensatory damages and the net worth of the defendant.
 

 [18]
 

 Evidence Code section 1150, subdivision (a) provides: “Upon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly. No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined.”
 

 [19]
 

 Ms. Peluso’s rate was based on her status as a paralegal.
 

 [20]
 

 Code of Civil Procedure section 1021.5 provides in relevant part: “Upon motion, a court may award attorneys’ fees to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement, or of enforcement by one public entity against another public entity, are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any. With respect to actions involving public entities, this section applies to allowances against, but not in favor of, public entities, and no claim shall be required to be filed therefor, unless one or more successful parties and one or more opposing parties are public entities, in which case no claim shall be required to be filed therefor under Part 3 (commencing with Section 900) of Division 3.6 of Title 1 of the Government Code.”
 

 [21]
 

 The Supreme Court in
 
 Serrano III
 
 found that the trial court had not abused its discretion in increasing the fees awarded in that case from the lodestar figure of $571,172.50, to $800,000, noting that the court had taken into consideration “various relevant factors, of which some militated in favor of augmentation and some in favor of diminution. Among these factors were: (1) the novelty and difficulty of the questions involved, and the skill displayed in presenting them; (2) the extent to which the nature of the litigation precluded other employment by the attorneys; (3) the contingent nature of the fee award, both from the point of view of eventual victory on the merits and the point of view of establishing eligibility for an award; (4) the fact that an award against the state would ultimately fall upon the taxpayers; (5) the fact that the attorneys in question received public and charitable funding for the purpose of bringing law suits of the character here involved; (6) the fact that the monies
 
 *1172
 
 awarded would inure not to the individual benefit of the attorneys involved but the organizations by which they are employed; and (7) the fact that in the court’s view the two law firms involved had approximately an equal share in the success of the litigation.”
 
 (Serrano III, supra,
 
 20 Cal.3d at p. 49, fn. omitted.)
 

 [22]
 

 The district court in
 
 Crommie
 
 determined that fees were available under both Code of Civil Procedure section 1021.5 and the FEHA, and without analysis held that California would calculate a fee award by application of the
 
 Serrano III
 
 standards.
 

 [23]
 

 Weeks’s attorneys accepted the case under a contingency fee agreement that provides “attorney may either retain or claim forty percent (40%) of any and all moneys or other compensation that may be paid or become due through settlement, arbitration, judgment, or otherwise; which includes attorney’s fees awarded in the above referenced matter. “. . . . . . . . . . . . . . . . . . . . . . . . . . . . . “Attorney is under no obligation to take or handle an appeal from any judgment or order obtained in the case. If attorney should decide to take or handle an appeal from any judgment or order, the attorney’s fee is increased to fifty percent (50%).”
 

 [24]
 

 It requires mention that the issues raised by the parties on appeal are not identical with those litigated in the trial court and that the length of this opinion does not reflect the time devoted in the trial court to issues such as the interpretation of Civil Code section 3294.